No. 101,029

STATE OF KANSAS, *Appellee*, v. RORY FOSTER, *Appellant*.

(233 P.3d 265)

Opinion filed June 11, 2010.

*Heather R. Cessna*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jerry B. Hathaway*, county attorney, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Rory M. Foster raises numerous challenges to his convictions for first-degree murder, rape, aggravated kidnapping, aggravated arson, aggravated criminal sodomy, aggravated battery, and criminal threat. He received a hard 50 off-grid life sentence for the first-degree murder conviction and additional sentences with a controlling term of 372 months' imprisonment for the other convictions. This resulted in an 81-year (972 months) total sentence. We have jurisdiction under K.S.A. 22-3601(b)(1) (direct appeal for conviction of an off-grid crime). We affirm the convictions and the sentences.

Foster raises 11 issues on appeal: (1) whether the district court was required to reconsider Foster's competency during trial; (2) whether the district court failed to properly address a potential conflict between Foster and his trial attorney; (3) whether a lesser included offense instruction for voluntary manslaughter was warranted; (4) whether there was a unanimous jury verdict on the

criminal threat and rape convictions; (5) whether a mistrial was required because a gallery member disrupted the proceedings; (6) whether specific photographs were properly admitted; (7) whether the prosecutor committed misconduct during opening statements and closing arguments; (8) whether there was cumulative error; (9) the constitutionality of the hard 50 sentencing scheme; (10) whether Foster's criminal history score needed to be proven to the jury beyond a reasonable doubt; and (11) whether the aggravating sentencing factors needed to be proven to the jury beyond a reasonable doubt.

We previously have rejected the latter three issues in earlier decisions and will not revisit them again in this appeal. It is sufficient to point out this court held the hard 50 sentencing scheme under K.S.A. 21-4635 constitutional in *State v. Engelhardt*, 280 Kan. 113, 142-43, 119 P.3d 1148 (2005); see *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 11, 221 P.3d 1105 (2009). We upheld a trial court's use of prior convictions to enhance guidelines sentencing without first proving the criminal history to a jury beyond a reasonable doubt in *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). And we determined the provisions in K.S.A. 21-4704 concerning aggravating sentencing factors did not violate the Sixth Amendment to the United States Constitution in *State v. Johnson*, 286 Kan. 824, 851, 190 P.3d 207 (2008). We decide the remaining eight issues in this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 25, 2006, Foster and his infant son flew from Florida to Kansas City International Airport to deliver the child to his mother, B.H., in Iola, Kansas. Foster rented a car near the airport to make the drive and stopped along the way to purchase boric acid, also known as roach powder.

Foster brought the boy to B.H.'s duplex apartment in Iola about 4:30 p.m., leaving the boy with his mother and R.R., her friend and roommate. Soon after Foster left, the boy's maternal grandmother came and took the infant to her house. B.H. and R.R. spent the evening with friends.

Shortly after B.H. and R.R. returned to the apartment at around 3:45 a.m., they heard someone turning the front door's doorknob. Foster entered, looking and acting upset. He searched the apartment for his son. After determining the boy was not there, Foster took the women's cell phones. Foster then pulled a knife and told both women to go to the bedroom. He threatened to kill them if they fought him.

Once in the bedroom, Foster again threatened to kill them if they did not remove their clothes. Foster ordered the women to perform oral sex on one another and him. During the forced oral sex, R.R. saw Foster open a condom. She asked him not to do that, but he told her to shut up. He inserted his penis into R.R.'s vagina. At one point, Foster left and walked into the hallway. R.R. tried to lock the bedroom door, but even with B.H.'s assistance, R.R. was not able to prevent Foster from forcing his way back into the room.

Shortly thereafter, Foster allowed R.R. to dress, but not B.H. He mixed the boric acid he had purchased earlier with water and told B.H. to drink it. She refused, so he threw it on her, burning her arm. Foster then forced R.R. into the bedroom closet. He again threatened to kill them both if R.R. said anything or tried to leave. While in the closet R.R. heard a struggle and kicking followed by silence. Through the closet door, R.R. saw B.H. wrapped in a blanket on the bed with Foster standing over her.

After a few more minutes, Foster took R.R. from the closet. When she came out, she saw a knife in B.H.'s throat. R.R. testified Foster threatened that if she told anyone about the incident both she and her family would look like that (referring to B.H. lying on the bed), and not even the witness protection program could help them. Foster then tried to stab R.R. with another knife, but she blocked him, escaping serious injury despite being cut. She promised Foster she would not talk about the incident. He told her to go to the living room.

Once there, he ordered her to again remove her clothes and lie down on the couch. R.R. pleaded with him not to rape her again. She promised to run away and not say a word. She testified she was so scared she took her clothes off and lay down. Foster again inserted his penis into her vagina. After a few minutes, he told her

to turn around and bend over. Foster inserted his penis into her anus. Afterwards, R.R. got dressed. Foster set fire to a washcloth and forced R.R. back to the bedroom. He poured alcohol onto B.H.'s corpse and threw the burning washcloth on B.H.'s body, starting a fire.

Foster allowed R.R. to leave. She drove to her mother's home, showered, and then told her mother Foster killed B.H. The mother called police and reported a possible murder. The responding officers evacuated two people from the duplex's second apartment. Upon entering B.H's apartment, officers found her partially burned body on the bed. Investigators determined the fire originated on or near B.H.'s body and concluded the fire was intentionally set.

Foster was arrested near the airport later in the morning of April 26. Police recovered evidence from the rental vehicle, a nearby trash can, and his person. This evidence included: (1) a receipt listing a "roach powder" purchase on April 25; (2) two receipts showing the purchase of new clothes, Band-Aids, and Clorox Oxi Magic on April 26; (3) jean shorts with blood-like stains; and (4) a used condom found inside the shorts' pocket. A receipt also was recovered at a truck stop in Garnett, Kansas, showing Foster purchased fuel that morning.

A forensic pathologist determined blood loss from two neck stab wounds caused B.H.'s death. DNA on Foster's shorts matched B.H.'s DNA. The DNA on the outside of the condom matched R.R.'s DNA, and DNA found on the inside matched Foster's.

Foster denied committing the crimes. His defense at trial was that after dropping off his son in Iola, he went to Joplin, Missouri, and stayed with a friend. He denied returning to Iola.

The jury convicted Foster on all seven counts charged. The district court sentenced Foster to life in prison with a hard 50 minimum on the first-degree murder conviction. The district court cited several aggravating factors including the burning of B.H.'s body. On the other convictions, the district court sentenced Foster to a controlling term of 372 months in prison. This resulted in a total sentence of 972 months. He appeals his convictions and sentences.

## ANALYSIS
### ISSUE 1: FOSTER'S COMPETENCY DURING TRIAL

Foster argues that despite having ordered him to Larned State Hospital for a competency evaluation, holding a competency hearing, and finding he was competent to stand trial, the district court should have revisited his competency to stand trial *sua sponte* under K.S.A. 22-3302 because of his subsequent behavior. Specifically, Foster cites two instances of "confusion" at trial that he contends should have signaled his competency was again an issue, requiring the court to suspend the trial to make a new competency determination.

We must decide first whether to consider this issue because Foster did not object or otherwise raise a question about his competency during trial. Issues not raised before the district court generally cannot be raised on appeal. Exceptions may be granted if: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; or (3) the district court's judgment may be upheld on appeal despite its reliance on the wrong ground. *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007); *State v. Anthony*, 282 Kan. 201, 206, 145 P.3d 1 (2006).

Foster's challenge raises due process concerns and questions the district court's compliance with a statutory obligation. We believe this warrants review. See *Shopteese*, 283 Kan. at 339 (though not raised below, the competency issue merited addressing because a court's acceptance of a plea by an incompetent defendant implicates due process); *State v. Harkness*, 252 Kan. 510, 514-17, 847 P.2d 1191 (1993) (defendant argued for first time on appeal that judge should have halted proceedings for another competency evaluation, and this court decided the issue); K.S.A. 22-3302(1) ("If . . . upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings shall be suspended and a hearing conducted to determine the competency of the defendant.").

*Issue 1 Standard of Review*

Both parties, citing *Lafferty v. Cook*, 949 F.2d 1546 (10th Cir. 1991), contend this first issue is a question of law subject to de novo review. But *Lafferty* addressed a related but separate question regarding the components of competency evaluations, which that court found was subject to de novo review. 949 F.2d at 1550. This question is not presented in Foster's appeal. Instead, we are asked whether the district court should have revisited Foster's competency because of his behavior during trial.

It is well settled we use an abuse of discretion standard when evaluating whether a district court made the correct decision regarding a defendant's competency to stand trial:

> " 'It is the trial court in whose mind a real doubt of sanity or mental capacity to properly defend must be created before [it] is required to order an inquiry solely on its own initiative. The necessity for an inquiry under such circumstances addresses itself to the discretion of the court and its decision will not be disturbed in the absence of abuse of sound judicial discretion.' " *Harkness*, 252 Kan. at 516-17 (quoting *Van Dusen v. State*, 197 Kan. 718, Syl. ¶ 6, 421 P.2d 197 [1966]).

Accordingly, we review this issue under an abuse of discretion standard. The party asserting the challenge bears the burden of demonstrating it. See *State v. Brown*, 285 Kan. 261, 303, 173 P.3d 612 (2007).

*Issue 1 Discussion: Foster's competence at trial*

Determining whether a defendant is competent to stand trial is governed by K.S.A. 22-3301 *et seq*. A defendant is incompetent to stand trial when he or she cannot understand the nature or purpose of the proceedings or cannot make or assist in making his or her defense because of mental illness or defect. K.S.A. 22-3301. This is in accord with the United States Supreme Court's standard, which states: " '[The t]est must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " *State v. Holloway*, 219 Kan. 245, 254, 547 P.2d 741 (1976) (quoting *Dusky v. United States*, 362 U.S. 402, 402, 4 L. Ed. 2d

824, 80 S. Ct. 788 [1960]), *overruled on other grounds State v. Hood*, 242 Kan. 115, 744 P.2d 816 (1987).

Also codified is a judge's duty to further inquire into a defendant's competency should the circumstances warrant. K.S.A. 22-3302(1) states: "If . . . upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings shall be suspended and a hearing conducted to determine the competency of the defendant." The failure to hold a competency hearing, when "evidence raises a bona fide doubt as to defendant's competency, is a denial of due process." *State v. Davis*, 281 Kan. 169, 177, 130 P.3d 169 (2006) (citing *Pate v. Robinson*, 383 U.S. 375, 378, 384-86, 15 L. Ed. 2d 815, 86 S. Ct. 836 [1966]); see *State v. White*, 263 Kan. 283, 316, 950 P.2d 1316 (1997).

In Foster's case, competency questions were raised early. The district court ordered him to Larned State Hospital for evaluation. Foster was admitted and stayed approximately 90 days. At the district court's subsequent competency hearing, Dr. J.L.L. Fernando, Foster's evaluating psychiatrist at Larned, expressed his opinion that Foster's history and manner did not suggest any psychiatric symptoms or illness preventing him from assisting his attorney and making known his concerns. The doctor said that while at Larned, Foster demonstrated he understood the charges against him and possible dispositions if he was found guilty. Dr. Fernando testified Foster was aware of a trial's purpose, courtroom proceedings, what various court officers do, and showed some understanding of the plea bargaining process. The doctor concluded Foster was competent to stand trial.

Dr. Fernando's report was also skeptical about Foster's claims of pretrial confusion. He wrote:

"Mr. Foster has indicated he 'gets confused' when discussing things, and therefore he may not be able to discuss matters with his attorney. This expressed 'confusion' has not been observed by the staff; on the contrary, Mr. Foster has been able to discuss issues on the unit well, make known his needs and to reason well. It is considered Mr. Foster's complaint of being 'confused' to be a concerted effort to show staff he is not competent to stand trial."

Based on Dr. Fernando's report and testimony, the district court found Foster competent to stand trial. Foster does not challenge this determination. But he argues the district court should have initiated another competency evaluation because of two incidents occurring during trial.

The first instance Foster directs our attention to occurred at the close of voir dire. The following exchange involving the court, defense attorney Michael Brown, and Foster occurred:

> "THE COURT: And, Mr. Brown, do you and your client accept the jury?
> "[FOSTER]: I do not, sir. Not yet, sir.
> "MR. BROWN: Sit down.
> "THE COURT: You need to have a seat, please, Mr. Foster."

During a short recess, the district court addressed Foster outside the jury's presence with this exchange:

> "THE COURT: All right. We are back on the record outside of the presence of the jury. Mr. Brown, I believe your client had something he wanted to discuss with you and you wished to bring it up outside the presence of the jury.
> "MR. BROWN: Yes. . . . I didn't understand Mr. Foster's question. I was under the impression he wanted to address the Court or bring up an issue with the Court, something about the jurors being seated, what have you. Is that a fair statement, sir?
> "[FOSTER]: Yes. Basically I don't understand the chart thing and what's going on; and based on the selection and stuff, I just think that some people that I mean shouldn't get included on the - - on the roster; and I just - - I don't understand anything that's going on here in the court; and that's why I wanted, to you know, let - - I just want everybody to, you know give me all the information; but my attorney is busy and stuff. I'm not able to get the right information and stuff. I was - - so before the bathroom break I was actually trying to see if we could meet in the small courtroom, like all of us, so we can discuss before got sit [*sic*] on the jury; and that was the situation; but now they're selected, that puts me in situation where I think it's not - - I did mean comfortable.
> "MR. BROWN: Well, Your Honor, I've given Mr. - - some time ago Mr. Foster a six-page letter explaining jury trial procedure, also visited with him and explained to him as far as jury selection is concerned it's not an exact science. He quite frankly in my opinion - -
> . . . .
> "[FOSTER]: . . . This is my first time in trial in general jury trial and situation. He can send me a lot of paper and stuff, but I'm not going to understand what all the paperwork is saying. If it's a lot of words, going to take a while, you know, not going to draw my attention to what's needed, so better for him to explain it

to me than me to actually read about it. So, that's why I was going - - trying to see if he explain to me what he was doing before he go ahead and jump into a situation I'm not prepared for."

The district court summarized the proceedings for Foster. The district court told him if he had other questions, he could ask his attorney over the noon hour. The court also told Foster he could not interrupt the proceedings again, but if he had additional questions, they could be raised during recesses.

The second alleged incident of confusion occurred before Foster testified in his own defense. Foster claims the record indicates he did not understand the process or the consequences for testifying. More specifically, he argues that despite defense counsel and the district court explaining the process and being advised against testifying, he still did not grasp how his testimony would work including questioning whether he could invoke his right against self-incrimination on certain questions. Further, he argues the district court's effort to educate him is proof his competency required reevaluation.

But we read the record differently. It shows there was communication between Foster and his counsel and that the district court interjected itself in the dialogue sufficiently to demonstrate Foster's grasp of the circumstances. The record indicates Foster understood the district court's explanations and signaled his understanding at the district court's and the prosecutor's later behests.

We find the district court did not abuse its discretion by failing to initiate further competency inquiries. After each instance of alleged confusion at trial, the district court took time to further explain what was happening. Foster acknowledged he understood the proceedings. The record shows there was communication between Foster and his counsel. We believe the trial court sufficiently alleviated any question as to whether Foster had the ability to consult with his attorney and understood the proceedings against him. This issue is without merit.

ISSUE 2: FOSTER'S CONCERNS ABOUT HIS TRIAL COUNSEL

Foster next argues there was an irreconcilable conflict with his trial counsel that required the district court's intervention. To sup-

port this, Foster cites three examples: (1) Foster interrupted voir dire to complain he did not understand the proceedings because his attorney had been too busy; (2) after the State rested its case, Foster told the court he was concerned about his attorney's failure to cross-examine one of the State's witnesses; and (3) upon the court's investigation of that complaint, Foster implied his attorney misled him about trial strategy.

### Issue 2 Standard of Review

To protect a defendant's right to counsel under the Sixth Amendment to the United States Constitution, a district court must inquire into potential conflicts between a defendant charged with a felony and defense counsel if (a) the court is aware of the conflict or (b) it is brought to the court's attention. *State v. Vann*, 280 Kan. 782, 789, 127 P.3d 307 (2006). A district court's failure to inquire is reviewed under an abuse of discretion standard. 280 Kan. at 789.

### Issue 2 Discussion: No further inquiry required regarding any claimed conflicts

Foster first complains the district court should have inquired after he disrupted voir dire. But as indicated above in Issue 1, the district court addressed Foster's concerns about jury selection and his complaint about not having enough time to talk with his attorney. At no point during that discussion did Foster indicate he believed his alleged confusion was caused by irreconcilable differences with his counsel. The district court gave Foster a brief summary of what had procedurally occurred up to that point. The district court told Foster if he had any other questions, he should ask his attorney over the recess. The district court also told Foster that while he was not permitted to interrupt the proceedings again, if he had questions he could raise them during recesses.

Foster did not claim at that time there was a conflict with his attorney, nor did he request new counsel. We note the record shows Foster capable of raising such issues because he requested and received new counsel twice prior to trial. Brown, who served as trial counsel, was Foster's third court-appointed attorney. The district court allowed Foster adequate time to describe his concerns. The record does not reflect circumstances sufficient to find

the district court should have inquired further into the possibility of an irreconcilable conflict between Foster and his trial attorney.

Foster next argues the court should have followed up when he complained about his attorney's lack of cross-examination. This arose after discussions about whether he would take the stand; Foster then told the court he had another question. He started with, "He was pretty brief with," and then he was interrupted by his attorney:

"MR. BROWN: Well, let me address that. Mr. Foster has expressed some dissatisfaction with the cross-examination that I conducted of the last witness. It was rather brief, given the testimony that she presented. He wants me to recall her to go over some of her preliminary hearing testimony, primarily some cross-examination conducted by David Clark.

"If the Court will recall, counsel in the latter part of his examination of that witness went through the fact that she gave a couple statements, I think to one officer and then there was a couple of statements in a courtroom where there was a progression where she didn't tell them some things in her first statement, then she told a little bit more in the second statement, but not all, and she did finally in the third one, and she gave an explanation as to why she could remember some stuff. I think there was some hair and a cigarette in an ashtray. Now, I will tell the Court I did review Mr. Clark's examination. In fact, I probably read that transcript four times at a minimum. I've tried to explain to Mr. Foster that I do not intend to recall that witness because I don't reprosecute my clients. If I were to recall that witness, I know what [the prosecutor] would do. He would just retry that case again to that witness, just turning his direct to a cross-examination; and it's not my habit to revisit certain things twice in the trial."

The court asked if there was anything else to be addressed. Brown stated he thought the cross-examination issue had been covered. Foster did not indicate otherwise. After Brown's explanation, there was no need to further inquire; the issue was resolved. Brown gave a thorough response to Foster's complaint.

In addition, trial strategy, after consultation with the defendant, is solely within defense counsel's domain. *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007). The witness Foster desired to have more thoroughly cross-examined was R.R., the surviving victim. She had already given a tear-filled, vivid, and graphic depiction of the April 2006 events. Brown's strategy was reasonable. This court has declined to find a conflict where the defendant and de-

fense counsel have differing opinions on trial strategy. See *State v. Banks*, 216 Kan. 390, 393-95, 532 P.2d 1058 (1975).

Finally, Foster argues the district court abused its discretion when it failed to further inquire into his complaint that his attorney misrepresented the number of defense witnesses to be called. This occurred during the discussion regarding Foster testifying on his own behalf. The prosecutor wanted to ensure Foster realized his testimony would be subject to cross-examination. Foster then asked the judge whether his attorney would call multiple witnesses as the State had done. The following exchange occurred:

"THE COURT: Yes, if he wishes to call additional witnesses or present additional evidence, that is certainly an option that he will have.

"[FOSTER]: Is there a way for me to know that right now?

"MR. BROWN: I intend to rest after Mr. Foster testifies.

"THE COURT: There's the answer to your question.

"[FOSTER]: That's not what I was told by my attorney.

"MR. HATHAWAY: He just told you.

"[FOSTER]: But he didn't like previously. That's not what he told me, so that's why I keep questioning because he keep[s] misleading me in a way.

"MR. BROWN: Well, how am I mis - - May I go in[to] this for ineffective assistance of counsel purposes? Let's deal with it right now.

"THE COURT: All right.

"MR. BROWN: I'd like to know what I told him.

"THE COURT: Mr. Foster.

"[FOSTER]: Basically the information I have is that he's - - the State go[es] first and my attorney goes up next, and he think he send [*sic*]some papers saying he's going to call port [*sic*] witness, something like that, port [*sic*] witnesses. Doesn't that mean he going to be calling some people up for questioning stuff?

"MR. BROWN: Your Honor, I've asked Mr. Foster if he has any witnesses and been provided none, so other than Mr. Foster I have no other witnesses to call; and I've conducted cross-examination to the best of my ability, so I don't intend to recall any State witnesses that will hurt me."

This was the conversation's extent. Once again, the issue was trial strategy. Further, there is nothing in the record to indicate there were other witnesses to call. But even if this showed a conflict, the court sufficiently inquired.

To summarize, these instances do not show evidence of any conflict with counsel or neglect by the district court. Where further inquiry was needed, and even when it was not, the district court

inquired. The district court did not abuse its discretion, and this issue fails.

### ISSUE 3: THE LACK OF A VOLUNTARY MANSLAUGHTER INSTRUCTION

Foster next claims the district court should have instructed the jury on the lesser included offense of voluntary manslaughter. He concedes he did not request that instruction, nor did he object to the district court's failure to give it.

*Issue 3 Standard of Review*

A district court must instruct the jury on lesser included crimes when there is some evidence that would reasonably justify a conviction of some lesser included crime. K.S.A. 22-3414(3); see *State v. Engelhardt*, 280 Kan. 113, 134, 119 P.3d 1148 (2005). But lesser included crime instructions are not required if the evidence would not permit a rational factfinder to find the defendant guilty beyond a reasonable doubt of the lesser included offenses. 280 Kan. at 134.

When a defendant does not object to a district court's giving or failure to give an instruction for a lesser included offense, stating distinctly the matter the defendant objects to and the grounds for the objection, it is reversible error only if the giving or failure to give the instruction was clearly erroneous. See K.S.A. 22-3414(3); *Engelhardt*, 280 Kan. at 134-35. Further, if a defendant did not request a lesser included offense instruction, a district court's failure to give the instruction is only clearly erroneous if a reviewing court "reaches a firm conviction that, had the instruction been given, there was a real possibility the jury would have returned a different verdict." *State v. Simmons*, 282 Kan. 728, 741, 148 P.3d 525 (2006) (citing *State v. Boone*, 277 Kan. 208, 220, 83 P.3d 195 [2004]).

*Issue 3 Discussion: Voluntary manslaughter instruction not required*

Foster argues district courts have an affirmative duty to instruct the jury on all lesser included offenses if there is evidence to support the instruction, even though the evidence may not be strong. Foster contends there was a real possibility the jury would have

returned a different verdict had the instruction been given because: (1) R.R.'s testimony that Foster entered the apartment in the early morning hours of April 26 distraught and searching for his son; (2) R.R.'s testimony that "throughout the ordeal . . . Mr. Foster consistently said things to [B.H.] in an apparent attempt to upset her or make her jealous, such as saying how much better R.R. was at oral sex than [B.H.]"; and (3) R.R.'s testimony that she heard Foster whisper to B.H.'s corpse that she "made him do it." Foster argues R.R.'s testimony painted "a consistent picture . . . that Mr. Foster apparently had anger directed at B.H."

The jury was instructed on, and convicted Foster of, premeditated first-degree murder, the intentional and premeditated killing of a human being. K.S.A. 21-3401(a). The jury was also instructed on intentional second-degree murder, which is the intentional killing of a human being. K.S.A. 21-3402(a). Intentional second-degree murder is a lesser included offense of first-degree murder. See K.S.A. 21-3107(b) (a lesser included crime is a crime where all elements of the lesser crime are identical to some of the elements of the crime charged). Voluntary manslaughter, for which an instruction was neither requested by Foster nor given by the district court, is "the intentional killing of a human being committed upon a sudden quarrel or in the heat of passion." K.S.A. 21-3403(a). It is a lesser included offense of both first- and second-degree murder. See K.S.A. 21-3107(a) (a lesser degree of those crimes); *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008).

To determine whether the voluntary manslaughter instruction was required, its elements must be reviewed. The key elements are: (1) an intentional killing; and (2) legally sufficient provocation. 286 Kan. at 874. In this case, the facts leave no question B.H. was killed intentionally. She bled to death after having been stabbed in the neck twice. The inquiry then is whether there would have been evidence to support a defense argument that Foster had legally sufficient provocation for the murder. See 286 Kan. at 874.

When reviewing whether provocation was legally sufficient, an objective test is used. 286 Kan. at 875. Foster claims the jury could have found he committed the murder in the heat of passion. "Heat of passion" has been found to mean "any intense or vehement

emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror," based "on impulse without reflection. [Citations omitted.]" *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985). But the provocation " 'must be sufficient to cause an ordinary man to lose control of his actions and his reason.' [Citations omitted.]" *Gallegos*, 286 Kan. at 875.

Foster did not make a provocation argument at trial. His defense was that he was not there. He testified he was innocent and 75 miles away in Joplin, Missouri. The evidence of premeditated first-degree murder and the jury's resulting conviction show Foster planned B.H.'s murder. R.R.'s testimony indicates the calculated and lengthy manner in which Foster implemented his attack and eliminates the possibility Foster was provoked into killing B.H. in the heat of passion. The evidence demonstrates a preplanned and prolonged attack on B.H., which led to Foster's first-degree murder conviction. We find no evidence to support giving the jury a voluntary manslaughter instruction.

The district court did not err by failing to give the jury the lesser included offense instruction on voluntary manslaughter.

### ISSUE 4: UNANIMOUS JURY VERDICT

Foster alleges his constitutional right to a unanimous jury verdict was violated regarding the criminal threat and rape charges because the district court failed to give a unanimity instruction; *i.e.*, the jury was not told to unanimously agree upon the specific criminal threat or rape that constituted each charge. In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003). This creates potential for uncertainty as to whether the jury unanimously agreed upon any particular act to convict on each specific charge. See *State v. Voyles*, 284 Kan. 239, 248, 160 P.3d 794 (2007).

No unanimity instruction was given to Foster's jury. The State alleges there were no multiple acts, arguing in its brief the events "were all part of one distinct act by the defendant." As an alternative position, the State contends any error was harmless. Foster

concedes he did not request a unanimity instruction on either charge.

*Issue 4 Standard of Review*

A defendant has a right to a unanimous jury verdict. See K.S.A. 22-3421; K.S.A. 22-3423(1)(d); *State v. Stevens*, 285 Kan. 307, 313, 172 P.3d 570 (2007). When this right is challenged, an appellate court must determine first whether it is presented with a multiple acts case. This is a question of law over which the appellate court exercises unlimited review. *Voyles*, 284 Kan. at 244 (quoting *State v. Kesselring*, 279 Kan. 671, 682, 112 P.3d 175 [2005]).

If the case is determined to be a multiple acts case, either the State must have informed the jury which act to rely upon in its deliberations or the district court must have instructed the jury to agree on the specific criminal act to convict. The failure to elect or instruct is error. *Voyles*, 284 Kan. at 244-45. When there is error, the final question is whether the error warrants reversal or was harmless. The test for harmlessness when a unanimity instruction was not requested or given is the clearly erroneous standard articulated in K.S.A. 22-3414(3). 284 Kan. at 252-53.

*Issue 4 Discussion: Multiple acts*

As we recently noted in *State v. Allen*, 290 Kan. 540, 544, 232 P.3d 861 (2010): "There is no single test for whether conduct constitutes one act or separate and distinct multiple acts. A test that applies to kidnapping may not apply to possessing a controlled substance." In *State v. Schoonover*, 281 Kan. 453, 506-07, 133 P.3d 48 (2006), we noted incidents are factually separate when independent criminal acts have occurred: (1) at different times; (2) at different locations; (3) when there was an intervening event, as opposed to a causal relationship between the acts; or (4) when a later act is motivated by a "fresh impulse." See *Kesselring*, 279 Kan. at 683. These factors are appropriate for our multiple acts analysis. Courts must look to the facts and the theory of the crime as argued to determine whether a jury verdict implicates unanimity issues. We will consider the criminal threat conviction separately from the rape conviction.

## A. Were there multiple acts of criminal threat?

To convict Foster of criminal threat, the jury was instructed it had to find Foster threatened to commit violence with the intent to terrorize R.R. See K.S.A. 21-3419. The facts show Foster spent at least an hour, perhaps longer, terrorizing B.H. and R.R. He threatened to kill them to get them into the bedroom and to undress. After he forced R.R. into the closet, he threatened to kill her if she tried to leave. After killing B.H., Foster threatened to kill R.R. and her family if she told anyone. All threats were made at nearly the same time and at the same location. R.R. testified she was terrified throughout the ordeal. And while other criminal acts occurred between Foster's multiple threats, it is difficult to see how they break the causal relationship between all of Foster's threats or demonstrate fresh impulses to commit multiple crimes of criminal threat.

Foster entered the apartment that morning carrying two knives. In conjunction with his words, he used the knives to gain R.R.'s compliance with his many demands, all of which constituted criminal acts. He preplanned his crimes by bringing the knives and buying boric acid. We find Foster was motivated by a broad and singular impulse to threaten and terrorize B.H. and R.R. The many threats were the result of a single impulse to terrorize the apartment's occupants. Because of this finding, no further analysis is required. See *Schoonover*, 281 Kan. at 506-07. A unanimity instruction was not necessary for the criminal threat charge.

## B. Were there multiple acts of rape?

Using the multiple acts factors for the rape conviction to determine whether the two incidents of vaginal penetration were part of one criminal act or multiple acts is more difficult. The jury was instructed that to convict on this charge, it must have been proven that (1) Foster and R.R. had sexual intercourse and (2) the act of sexual intercourse was committed without R.R.'s consent because she was overcome by force or fear. See K.S.A. 21-3502(a)(1)(A). R.R. testified she was raped twice, once before B.H. was killed and once after. Each occurred close in time to the other, and each occurred in the apartment, though in different rooms.

The difficulty with this issue is determining whether Foster was motivated by a "fresh impulse." There is evidence the murder was premeditated at least hours in advance. It is conceivable the first penetration was motivated, in part, by Foster's desire to terrorize B.H, but it just as easily could have been motivated by a separate impulse. The second penetration could have been motivated by yet another impulse. An additional consideration is whether an intervening murder makes two close-in-time vaginal penetrations the product of different criminal impulses despite their taking place during one episode.

Ultimately, we believe the facts present two separate rapes. See *State v. Zamora*, 247 Kan. 684, 694, 803 P.2d 568 (1990) (separate acts of penetration constitute separate charges of rape). After the first penetration, Foster allowed R.R. to put her clothes back on but later ordered her to remove them again before the second penetration. In addition, the second penetration occurred after Foster attempted to force B.H. to drink boric acid, after he forced R.R. into the closet, and after he killed B.H. These are significant events in deciding Foster was not motivated by a single criminal impulse.

To proceed under these facts, it was necessary either for the State to inform the jury which acts to rely on in its deliberations or for the court to instruct the jury to agree on the specific criminal act supporting the rape conviction. The failure to elect or instruct was error. See *Voyles*, 284 Kan. at 244-45. Accordingly, since a unanimity instruction was neither requested nor given, the proper standard for review to determine whether the error requires reversal or was harmless is the clearly erroneous standard articulated in K.S.A. 22-3414(3) and *Voyles*, 284 Kan. 239, Syl. ¶ 3.

In this case, Foster made a general denial as his defense. He testified he was in Joplin, Missouri, 75 miles away, when the crimes occurred. R.R., the surviving victim, testified Foster was in Iola committing the crimes. There was a substantial amount of physical evidence supporting R.R.'s version, including B.H.'s blood on Foster's jean shorts, R.R.'s and Foster's DNA on a used condom found in Foster's jean shorts, and a fuel receipt placing Foster in Garnett, a town near Iola, shortly after the crimes were committed. The jury

convicted Foster of every crime R.R. testified he committed, including first-degree murder, aggravated arson, aggravated kidnapping, and aggravated criminal sodomy. If the unanimity instruction had been given on the rape charge, we find the result would have been the same. The jury still would have convicted Foster of rape.

Foster attempts to exploit language in *Voyles* about inconsistent testimony from the victim, in which it was said: "When a unanimity instruction was not requested or given but the defendant has made a general denial, error may be reversible when the trial is not merely a credibility contest between the victim and the defendant, *e.g.*, due to inconsistent testimony from the victim." 284 Kan. 239, Syl. ¶ 5.

Foster contends R.R. "changed her story multiple times" in statements to law enforcement because she failed to disclose the rape until her last police interview. Foster then asserts it was necessary for the jury to determine which of the victim's statements were credible and which acts constituted the charge of rape when there were more acts presented than were actually charged.

But while it is true R.R. did not provide the rape details until her final statement to police, her trial testimony was consistent with that statement and there were never any significant contradictions. This cannot reasonably be characterized as changing her story multiple times about the acts supporting the rape conviction, as Foster now argues. In *Voyles*, the inconsistent statements at issue specifically dealt with the dates, times, locations, and other relevant details to the separate-but-distinct issue in the multiple acts analysis. Those details potentially demonstrated 20 different acts or offenses were committed when the defendant was charged with 8 crimes. See 284 Kan. at 244. That problem is not present in Foster's case.

The only witness credibility choice for the jury was between (a) Foster saying he was in Joplin the entire time and did not commit the crimes or (b) R.R.'s testimony that Foster was in Iola and committed the crimes. The jury did not have to pick among contradicting accounts from differing victim's statements to piece together the elements of the offense charged in order to find Foster committed rape. R.R.'s statements about this were consistent, and Foster's argument is without merit.

Issue 5: Mistrial for Disruption from Public Gallery

Next, Foster argues the district court erred when it denied his motion for mistrial after Foster's father, who was seated in the public gallery while R.R. was testifying, started "sobbing hysterically" and was escorted from the courtroom. Foster argues "the view of Mr. Foster's *own father* being so moved by R.R.'s statements about the events that night [*sic*] that he burst into tears in the middle of her testimony had a severely prejudicial effect on Mr. Foster's cases." Foster contends the episode lent credibility to the victim's accounts over Foster's denials. Parenthetically, we note the record does not reflect the jury knew the man's identity or his relationship to Foster, which distracts from Foster's argument but is not determinative.

*Issue 5 Standard of Review*

As a general rule, a district court's ruling on a motion for a mistrial is reviewed for abuse of discretion. A defendant alleging the error bears the burden of proving his or her substantial rights to a fair trial were prejudiced. *State v. White*, 284 Kan. 333, 342, 161 P.3d 208 (2007).

Foster argues we should review this issue de novo, citing *State v. Manning*, 270 Kan. 674, 696, 19 P.3d 84 (2001), and *State v. Gary*, 282 Kan. 232, Syl. ¶ 1, 236-37, 144 P.3d 634 (2006). But *Manning* actually supports the State's arguments that abuse of discretion is the proper standard. 270 Kan. at 696. The *Gary* court stated abuse of discretion standards can sometimes be characterized as questions of law requiring de novo review. 282 Kan. 232, Syl. ¶ 1. Foster's reliance on *Gary* is based on a misunderstanding of the issue it addressed. The *Gary* court answered a question requiring statutory interpretation, which unlike the issue presented here, was a question of law subject to de novo review. 282 Kan. at 236-37.

Foster urges it is necessary to interpret K.S.A. 22-3423(1)(c), which states:

"(1) The trial court may terminate the trial and order a mistrial at any time that he finds termination is necessary because:

. . . .

(c) Prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution."

Specifically, Foster contends the phrase "impossible to proceed with the trial without injustice" requires interpretation. He gives no reason why this issue requires statutory interpretation, and we see none. The statute clearly gives a district court the discretion to grant a mistrial if it finds it is impossible to proceed without injustice. When a statute's meaning is clear, there is no need to resort to statutory construction. *Double M. Construction v. Kansas Corporation Comm'n*, 288 Kan. 268, 271-72, 202 P.3d 7 (2009).

This court has long used an abuse of discretion standard when determining whether denying or granting a mistrial was appropriate under K.S.A. 22-3423. *State v. Culbertson*, 214 Kan. 884, Syl. ¶ 1, 522 P.2d 391 (1974). The abuse of discretion standard even predates the statute. See *State v. Hansford*, 76 Kan. 678, 92 P. 551 (1907) (it is within the district court's discretion to discharge a jury and order a mistrial), *overruled on other grounds State v. Sandstrom*, 225 Kan. 717, 595 P.2d 324, *cert. denied* 444 U.S. 942 (1979). There is no merit to Foster's argument that the statute requires interpretation. The proper standard of review is abuse of discretion.

*Issue 5 Discussion: The disruption did not require a mistrial*

While Foster describes this episode at trial as his father "sobbing hysterically," the records shows this is a mischaracterization. The transcript reflects the following exchange, which occurred outside the jury's presence, after the outburst:

"MR. BROWN: . . . [D]uring the examination of the last witness, [R.R.,] if Court and counsel recall, I stood up at a certain point in counsel's examination of that witness and asked if it be a good time to take a break. The reason for that . . . was that we had some type of a reaction out in the gallery . . . I would describe as sobbing. I don't know if it was a male or female. I never did turn to look, and it went on for a little bit. I'm not talking in terms of minutes, but probably a good thirty seconds or so before I made the request, and it got worse, and I think the Court decided rather than to take a brief recess to have that person from the gallery escorted out of the courtroom, but I could not help but note that that reaction from the gallery caught the jurors' attention. I noticed several of them looking over there, and I have a concern as to that reaction from - - I hate to use

the word assume. Maybe it was a family member of [R.R.'s]. I don't know. . . . I think that reaction from the gallery may have possibly prejudiced this jury as far as invoking some type of emotion or sympathy; and that being the case I'd like the Court to consider a motion for mistrial, please.

. . . .

"[MR. HATHAWAY]: . . . If it makes any difference, from my vantage point where I was standing at an angle and I did see who it was; and it was [Foster's] father. The other point I will bring up is - - and I am not in any way trying to be trite about this. What that did was take away - - take a little bit attention away perhaps from the witness victim who was sobbing and crying throughout her testimony, and so we'd ask you deny that motion.

"THE COURT: Well, the motion for mistrial is noted, but denied. I have never met Mr. Foster's father. The gentleman who was sobbing and did break down was seated directly behind Mr. Brown and Mr. Foster, next to another woman, who I believe, Mr. Brown, if I am correctly recalling, you previously identified as Mr. Foster's father and a cousin I believe.

. . . .

"THE COURT: I also would comment that as far as Mr. Foster's father being escorted out of the courtroom, he got up on his own initiative with the assistance of the - - the woman who was seated next to him; and they began to exit the courtroom on their own. I believe Sheriff Williams did come and offer some assistance, but I would not categorize it as him being escorted out of the court-room, and I felt at that point in time that the best course of action would be to go ahead and allow the State to continue to proceed rather than interrupting the testimony at that point in time. . . .

"MR. BROWN: Also understand you have had a better viewpoint than I did.

"THE COURT: Certainly.

"MR. BROWN: Okay. Thank you."

K.S.A. 22-3423(1)(c) permits a district court to declare a mistrial because of "prejudicial conduct, in or outside the courtroom, which makes it impossible to proceed with the trial without injustice to the defendant or the prosecution." A district court is under a duty to declare a mistrial " 'where there is some fundamental failure of the proceeding. When an event of prejudicial misconduct, the damaging effect which cannot be removed by admonition and in-struction, is presented to the jury.' " *White*, 284 Kan. at 343 (quot-ing *State v. Lewis*, 238 Kan. 94, 97, 708 P.2d 196 [1985]).

We are aware of no decision from this court finding a gallery member's conduct prejudicial to the degree that a mistrial was required, and we are not referred to any by Foster. But the facts here are sufficiently analogous to other circumstances in which

defendants have sought a mistrial that some comparisons are possible.

In *State v. Richard*, 252 Kan. 872, 850 P.2d 844 (1993), the trial judge walked over and gave the victim witness a box of tissues while she was crying on the stand. The defendant objected, arguing it was prejudicial because the judge failed to maintain impartiality by showing sympathy. The defendant asked the court for a mistrial, which was denied. The issue was pursued on appeal, and this court refused to find an abuse of discretion, stating:

> "Trials are frequently emotionally traumatic for witnesses who are personally involved in the events to which they are testifying. Acts of common courtesy should be encouraged, not discouraged. There is nothing in the record before us to indicate that the trial judge exceeded any boundaries or levels of judicial propriety in handing a tissue to a crying witness. We find no error or judicial impropriety." 252 Kan. at 878.

In *State v. Minski*, 252 Kan. 806, 850 P.2d 809 (1993), the defendant objected to the district court's ex parte discussion with, and dismissal of, a juror who fainted. The district court did not question the remaining jurors about whether the fainting juror had any impact on their ability to be impartial. Nor did the district court give the remaining jurors a cautionary instruction. Under these circumstances, the *Minski* court held the district court did not abuse its discretion when refusing to grant a mistrial. 252 Kan. at 812-15.

This court also upheld a district court's refusal to grant a mistrial when the defendant had an emotional outburst. In *State v. Perkins*, 248 Kan. 760, 811 P.2d 1142 (1991), the defendant threatened to kill himself in an obscenity-laden tirade about the integrity of the Kansas court system and his perception that his rights were being violated. This occurred in the jury's presence. The judge ordered the defendant removed from the courtroom. The defense moved for a mistrial, which was denied. After the lunch break the defendant, "crying and shaking," refused to return to the courtroom. 248 Kan. at 769. The next morning the defense again moved for a mistrial, citing concern about the defendant's competency. Relying on the defendant's competency evaluations, which stated disruptive behavior by the defendant would be "volitional in nature and

not the result of a major mental illness," the district court again denied a mistrial. 248 Kan. at 769. This court held the district court did not abuse its discretion. 248 Kan. at 769.

Foster directs our attention to *State v. Franklin,* 167 Kan. 706, 208 P.2d 195 (1949), in which the deceased victim's mother during a second-degree murder trial stood up in the gallery, while the defendant was testifying in his own defense, and screamed four times, "He killed my son." 167 Kan. at 709. Foster acknowledges this court found the outburst did not deny that defendant a fair trial, but he claims the case illustrates why a mistrial should have been declared in his case. He asserts this court cannot be certain beyond a reasonable doubt that the sight of his own family being moved to tears by the victim's testimony did not prejudice his rights. But that is not the test we must apply.

In this case, the evidence does not support finding the district court abused its discretion when it denied a mistrial. The trial transcript demonstrates the judge was aware of the disturbance; but because Foster's weeping father quickly left the courtroom with minimal disturbance, the district court found "the best course of action [was] to go ahead and allow the State to continue to proceed rather than interrupting the testimony at that point in time." The transcript also informs us that Foster's counsel agreed the district court judge had the best view of what happened. These facts do not rise to the level of disturbance or potential prejudice argued in *Richard, Minski, Perkins,* or *Franklin.*

Contrary to what Foster now argues, there was no hysterical display of emotion requiring his father to be escorted from the courtroom. There is no evidence the jury was prejudiced by the father's emotional display. As the *Franklin* court observed: "That such outbursts and demonstrations often occur during the trial of homicide cases cannot be denied and they are familiar to the bench and bar of this and every other state." 167 Kan. at 709.

Finally, we note the defense, after acknowledging the judge's better view of what occurred, did not request the jury be admonished or given a cautionary instruction, nor did counsel further argue the issue warranted a mistrial. The district court did not abuse its discretion by denying Foster's motion for mistrial.

## ISSUE 6: ADMISSION OF PHOTOGRAPHS WITHOUT OBJECTION AT TRIAL

At trial, Foster did not object to the admission of three photographs he now argues were prejudicial, specifically exhibits 7, 9, and 10. He concedes this, but he argues we should consider the issue for the first time on appeal to prevent a denial of his fundamental right to a fair trial. His argument is without merit and previously rejected by this court in other cases in which we emphasized the importance of following the legislative mandate in K.S.A. 60-404 requiring a timely and specific objection to preserve for appeal an issue regarding the admission of evidence. See *State v. Richmond*, 289 Kan. 419, 428-29, 212 P.3d 165 (2009); *State v. King*, 288 Kan. 333, 348-49, 204 P.3d 585 (2009). We decline to consider the issue under these circumstances.

## ISSUE 7: PROSECUTORIAL MISCONDUCT

Foster next objects to the prosecutor's remarks made during opening statements and closing arguments, which included descriptions of the crimes as "extreme brutality," "complete terrorization," and "sexual depravity." He argues such terms were inflammatory and outside the wide latitude afforded prosecutors, invaded the province of the jury, were gross and flagrant, and showed ill will.

### Issue 7 Standard of Review

Foster did not contemporaneously object to the State's comments, but a timely objection is not required to preserve a prosecutorial misconduct claim that occurs during opening statements or closing arguments. *King*, 288 Kan. at 349; *State v. Decker*, 288 Kan. 306, 314, 202 P.3d 669 (2009). An appellate court employs a two-step analysis regardless of whether a timely objection is made.

First, the court determines whether the prosecutor's statements exceeded the wide latitude of language and manner afforded a prosecutor. Inherent in this latitude is the prosecutor's freedom to argue reasonable inferences from the evidence. Second, the court determines whether the prosecutor's comments constitute plain error. This occurs when the statements are so gross and flagrant

they prejudiced the jury against the defendant, denying the defendant a fair trial. This requires examination of three factors: (1) whether the misconduct was so gross and flagrant it denied the defendant a fair trial; (2) whether the remarks showed ill will; and (3) whether the evidence against the defendant was of such a direct and overwhelming nature that the prosecutor's statements would not have much weight in the jurors' minds. *Decker*, 288 Kan. at 314-15; see *State v. Tosh*, 278 Kan. 83, 97-98, 91 P.3d 1204 (2004).

None of these three factors is controlling. Further, the third factor can never override the first two until the harmlessness tests of both K.S.A. 60-261 (prosecutor's statements were inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824, (error had little, if any, likelihood of changing the outcome of trial) *reh. denied* 386 U.S. 987 (1967) ), have been met. *State v. Morningstar*, 289 Kan. 488, 496, 213 P.3d 1045 (2009); *State v. Scott*, 286 Kan. 54, 78-79, 183 P.3d 801 (2008).

Because prosecutors have a duty to properly present the State's cases with earnestness and vigor and to use every legitimate means to bring about just convictions, they are afforded wide latitude in arguing their cases. Inherent in this wide latitude is the freedom to craft arguments that include reasonable inferences based on the evidence. *King*, 288 Kan. at 351.

*Issue 7 Discussion: There was no prosecutorial misconduct*

Foster argues the text from the prosecutor's opening statements and closing arguments, emphasized below, was inflammatory and outside the wide latitude afforded prosecutors, *i.e.*, a violation of the first prong of the prosecutorial misconduct analysis. Specifically he now objects to the prosecutor stating during opening statements, "This is the beginning of what can only be described as an early morning of *extreme brutality* resulting in the death of one young woman and the *complete terrorization* of another at the hands of the defendant." He also objects to the prosecutor's description of upcoming evidence as acts of *"sexual depravity* perpetrated on these two young girls." From the closing arguments, Foster objects to the prosecutor stating, "[T]he defendant has got

two people in that bedroom committing all kinds of *unspeakable acts*."

We find these remarks based on the evidence and within the wide latitude given to prosecutors. As the trial unfolded, the prosecutor presented evidence that the crimes committed were extremely brutal and terrorizing, the latter of which is an element of criminal threat. See K.S.A. 21-3419. Furthermore, the brutality and terrorization comments were immediately followed by a list of the crimes charged. The prosecutor stated, "It can also be described as first-degree murder, rape, aggravated sodomy, aggravated arson, aggravated kidnapping, aggravated battery, and criminal threat."

The sexual depravity comment immediately followed an in-depth description of the acts R.R. would testify Foster made her and B.H. do, including performing oral sex on Foster and on one another, in addition to Foster raping and sodomizing R.R. The sexual depravity language concisely summarized the acts the prosecutor had just discussed. Finally, the "unspeakable acts" phrase fits within the evidence supporting this conviction.

To be sure, the prosecutor used powerful language to describe the evidence, but no more so than prosecutors in other cases where this court has refused to find prosecutorial misconduct. See *State v. Nguyen*, 285 Kan. 418, 422-26, 172 P.3d 1165 (2007); *State v. Alger*, 282 Kan. 297, 304-06, 145 P.3d 12 (2006). Further, under the circumstances in this case, the prosecutor's words characterizing the acts perpetrated on B.H. and R.R. were less inflammatory than the factual descriptions themselves. These remarks pass the first prong of the analysis; they were within the wide latitude afforded a prosecutor. No further analysis is required regarding these remarks.

Foster next complains of additional comments made during closing arguments. He objects to three statements by the prosecutor: (1) "So there's definitely a substantial risk of bodily harm to those two people in [the adjacent apartment]"; (2) "[The knife]'s a deadly weapon in the defendant's hands"; and (3) "[R.R.] was definitely overcome by force or fear." Foster argues these statements invaded the province of the jury, were gross and flagrant, and deprived

Foster of a fair trial. Additionally, he argues that when considered with the comments made during opening statements, they show the prosecutor's ill will.

The State replies that the complained-of comments, when taken in context, were within the wide latitude given to a prosecutor or, alternatively, were harmless because of the overwhelming weight of the evidence. The State contends that because these comments were prefaced with questions, they were permissible.

We find that when read in context, the prosecutor's comments were reasonable inferences drawn from the evidence that did not invade the province of the jury. Specifically, the prosecutor said:

"The elements of all the crimes charged in this case were set out in the jury instructions. Every one of them has to be proven beyond a reasonable doubt by me, the State. I am going to go through those elements with you . . . .

. . . .

". . . The defendant intentionally put that burning washcloth on that bed and on [B.H.]. Is there a human being in that building? Well, folks, unfortunately that human being wasn't [B.H.]. She was dead. The human beings we're referring to in that duplex were the two that Officer Andres testified about next door at 412. They were there. Now, was there substantial risk of bodily harm? We submit to you there definitely was. There's two risks. . . .It creates a substantial risk because it's going to burn - - it may or may not burn down; but, you know, the other substantial risk - - and you folks know this again, common sense - - what kills most people in house fires? It's not the flame is it? It's the smoke inhalation. So there's definitely a substantial risk of bodily harm to those two people in 412.

"The aggravated battery charge is charged against - - of the defendant committing aggravated battery against [R.R.]. He caused bodily harm to more than one person; but in this case, he caused bodily harm to [R.R.]. And you remember her testimony when he pulled her out of the closet and held her down over the body of [B.H.] and threatened her again that this would happen to her and not even witness protection program could help her, and then he brought the knife across in a slashing motion, and [R.R.] raised her hand in defensive motion, and she got cut. That's the bodily harm. Was it done with a deadly weapon? Ladies and gentleman, you saw, you heard, and you will see again what he did with that knife to [B.H.]. That's a deadly weapon in the defendant's hands."

This was permissible prosecutorial argument based on the evidence. This issue has no merit.

### ISSUE 8: CUMULATIVE ERROR

Foster argues that even if all the above errors are found harmless, cumulatively they substantially prejudiced him and denied

him a fair trial. This argument fails because, as addressed above, the only issue in which we found error was within Issue 4, *i.e.*, this was a multiple acts case requiring a unanimity instruction on the rape charge.

Cumulative trial errors, when considered collectively, may be so great as to require a defendant's convictions to be reversed. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. A single error does not constitute cumulative error. See *State v. Ellmaker*, 289 Kan. 1132, 1156-57, 221 P.3d 1105 (2009) (where multiple errors have not been found, cumulative error doctrine is inapplicable).

## Conclusion

Each of the 11 issues raised by defendant Rory M. Foster in this appeal lacks merit. The convictions and sentences are affirmed.

Davis, C.J., not participating.

John C. Gariglietti, District Judge, assigned.