0IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 108,998

STATE OF KANSAS,
*Appellee*,

v.

KISHEN L. WOODS,
*Appellant*.

SYLLABUS BY THE COURT

1.

The criminal trial of an incompetent person violates due process.

2.

Under K.S.A. 22-3301(1), a defendant is incompetent to stand trial when the defendant cannot understand the nature or purpose of the proceedings or cannot make or assist in making the defendant's defense because of mental illness or defect.

3.

K.S.A. 2011 Supp. 22-3302 governs the determination of competency to stand trial. Under its provisions, the defendant, the defendant's counsel, or the prosecuting attorney may request a determination of the defendant's competency to stand trial. If upon the request of either party, or upon the judge's own knowledge and observation, the judge before whom the case is pending finds there is reason to believe the defendant is incompetent to stand trial, the proceedings must be suspended and a hearing conducted to determine the defendant's competency.

1

4.

Under K.S.A. 2011 Supp. 22-3302, when a defendant is charged with a felony and the conditions requiring a hearing are met, a district judge must conduct a competency hearing, with or without a jury within the judge's discretion, and may order a psychiatric or psychological examination of the defendant.

5.

A defendant may raise both procedural and substantive competency claims. A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing or the failure to hold an adequate competency hearing. A substantive competency claim alleges an individual was tried and convicted while incompetent.

6.

The standard for assessing whether a State's procedure for determining competency comports with due process is whether the procedure affords the criminal defendant on whose behalf the plea of incompetence is asserted a reasonable opportunity to demonstrate the defendant is not competent to stand trial.

7.

On appeal, a reviewing court's inquiry regarding a district court's decision that a defendant is competent to stand trial is whether the trial court abused its discretion.

8.

A party who raises the issue of competence to stand trial has the burden of going forward with the evidence, which will be measured by the preponderance of the evidence standard. When the court itself raises the competency issue, the court is not a party and cannot be responsible for coming forward with evidence but can assign that burden to the

State because both the court and the State have a duty to provide due process and to provide a fair trial to the defendant.

9.

There is a presumption that a defendant is competent to stand trial.

10.

In determining whether a defendant's inculpatory statements to a law enforcement officer were freely and voluntarily given, a trial court looks at the totality of the circumstances surrounding the statements and determines their voluntariness by considering the following nonexclusive factors: (a) the defendant's mental condition; (b) the manner and duration of the interviews; (c) the defendant's ability to communicate on request with the outside world; (d) the defendant's age, intellect, and background; (e) the officer's fairness in conducting the interviews; and (f) the defendant's fluency with the English language.

11.

K.S.A. 22-3408(3) provides that a district court in a criminal case may limit voir dire examination by the defendant, the defendant's attorney, or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay, or serves no useful purpose.

12.

When sufficiency of the evidence is challenged in a criminal case, an appellate court's standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the reviewing court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not

3

reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility.

13.

Under K.S.A. 2011 Supp. 22-4906(a)(1)(F), all defendants convicted of first-degree murder must register under the Kansas Offender Registration Act, K.S.A. 22-4901 *et seq*. That statutory subsection does not require a district court to find that the crime occurred with a deadly weapon.

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed May 1, 2015. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause, and *Rachel L. Pickering*, of the same office, was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  Kishen L. Woods appeals his conviction and sentence for first-degree premeditated murder following the shooting death of his wife in broad daylight on a residential street outside their Wichita home. Woods advances several claims, some of which are interrelated. He contends the district court erred by:  (1) failing to conduct an adequate hearing about his competence to stand trial; (2) finding him competent to stand trial; (3) failing to *sua sponte* order a second competency evaluation later in the proceedings due to his erratic behavior; (4) finding his confession to the police was freely and voluntarily given; (5) limiting the defense voir dire of potential jurors regarding mental illness and mental disability; (6) overruling his claim of insufficient evidence to

4

support the first-degree murder conviction; (7) refusing to give a lesser included offense instruction on voluntary manslaughter; and (8) committing cumulative error. As to sentencing, he argues an *Apprendi* violation occurred when the district court ordered him to register as a violent offender, and further error when the district court had Woods sign a Notice of Duty to Register. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Antonia Woods-Cratic sustained three gunshot wounds. One entered her left arm, exited her shoulder, and struck her jaw. The coroner testified this was consistent with someone lifting their arm as if to protect themselves from getting hit by something. A second shot entered the left side of her abdomen and traveled down into her left buttock. A third bullet entered her left scalp over her ear and perforated her brain. She died from the gunshot wound to the head. The coroner could not determine the order of the shots fired. Bullet fragments found in Woods-Cratic's body were identified as being fired from Woods' revolver.

Woods was apprehended at the scene. He made several incriminating statements to the arresting officer. He was also questioned by detectives in a videotaped interview a short time later at the police station, during which he admitted killing his wife. A jury convicted him of premeditated first-degree murder and criminal possession of a firearm.

Although many facts in this case are relevant to more than one issue, we attempt to provide the facts in a logical order as pertinent to the issue presented without unnecessary duplication.

Woods advances three challenges regarding his competency to stand trial. First, he argues the competency hearing was inadequate. Second, he contends the district court erred when it concluded he was competent to stand trial. Third, he claims the court should have *sua sponte* ordered a second competency evaluation. None of these issues were raised by Woods below because he actually objected to the court's independent inquiry into his competence. We hold there was no error.

*Additional facts*

During a pretrial motions hearing, Woods' attorney informed the court that Woods had been previously diagnosed with schizophrenia and was not taking medication. Counsel said she had discussed a mental disease or defect defense with Woods, but Woods strongly preferred not pursuing it. Counsel stated Woods understood the charges against him and had been able to assist in his defense, but she believed he suffered from mental illness. Woods repeatedly interrupted, objecting to any discussion of mental illness. He frequently characterized the subject as insulting and stated he was an intelligent person. He made numerous other comments during this proceeding, such as stating his belief that the court could not help him, and declaring at one point, "It ain't really no help if the evidence that the State have against Kishen Woods."

The district court initially ordered a psychological evaluation, but that order was later modified to require a competency evaluation under K.S.A. 2011 Supp. 22-3302. The district court stated it believed Woods understood the charges but was not assisting in making his defense. The court also indicated it didn't know if "that was because it was a conscious decision or because of some component of psychological distress he's suffering from." Woods again objected to the court-ordered evaluation stating, "I already been

6

down that road several years ago." He said he knew he was "not incompetent and I don't want to be wasting my time and my months and any more weeks on the same issue of this case."

The court-ordered competency evaluation was conducted by COMCARE, a Sedgwick County mental health organization where Woods had previously received services. The evaluator noted Woods had been diagnosed in 2009 with polysubstance dependence during a restorative treatment for an earlier competency issue in another criminal case. Woods' diagnoses between 2009 and 2011 included "Schizophrenia Paranoid Type and Polysubstance Dependence." At the time of the current evaluation, Woods' primary diagnosis was "Adjustment Disorder Unspecified," with a notation that "his impulsive behaviors . . . are reflective of his lower level of intellectual functioning and Antisocial Personality Disorder, as diagnosed by [Larned State Security Hospital] medical staff in 2009."

The evaluator concluded that Woods did not present with psychotic symptoms, and, for the most part, his thought processing was logical and thought content normal. His intellectual functioning was previously documented to be in the mild mental retardation range, and the evaluator explained Woods "is especially sensitive about this diagnosis." Woods said several times during the evaluation that he was "highly intelligent" and understood the charges, the penalty, the courtroom procedures, and roles of the participants.

The evaluator determined Woods was competent to understand the nature of the proceedings and assist in his defense. The evaluator further noted Woods could identify his attorney and had said he would continue working with her, believing she would "'support me the best she can.'" The evaluation concluded by observing that Woods'

conversation was at times erratic, but "it was likely not related to psychotic symptoms or mood disorder, but his effort to derail the process."

A competency hearing was held, during which Woods erupted into a tirade. He characterized the competency evaluation as an insult and indicated frustration that it was taking so long to begin trial. For example, he interjected, "Do you want to convict me of a murder case or do you want to insult my intelligence. . . . Because I'm tired . . . I'm tired of you bringing me up in here and keep insulting me a black man." Woods' outbursts continued through several attempts by the district court to complete the competency hearing. Eventually, the court read several sections from the COMCARE report into evidence and noted the evaluation had concluded that Woods was competent. In ruling Woods competent to stand trial, the district court stated, "I will defer to the professional in this case. . . . She has deemed in her opinion you are competent for trial."

Woods' competency to stand trial was not mentioned again during the proceedings, but there were a few instances when the court addressed Woods' behavior on the record during trial. Those will be discussed in the context of Woods' claim that the court should have *sua sponte* ordered a second evaluation.

*Competency hearings under Kansas law*

The criminal trial of an incompetent person violates due process. *Medina v. California*, 505 U.S. 437, 453, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992). In Kansas, K.S.A. 22-3301 *et seq.* governs competency to stand trial. A defendant is incompetent to stand trial if charged with a crime and, because of mental illness or defect, that defendant is unable: "(a) To understand the nature and purpose of the proceedings against [the defendant]; or (b) to make or assist in making [the defendant's] defense." K.S.A. 22-3301; accord *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)

8

("[The t]est must be whether [the defendant] has sufficient present ability to consult with [the defendant's] lawyer with a reasonable degree of rational understanding—and whether [the defendant] has a rational as well as factual understanding of the proceedings against [the defendant]."); see also *State v. Foster*, 290 Kan. 696, 703, 233 P.3d 265 (2010) ("A defendant is incompetent to stand trial when he or she cannot understand the nature or purpose of the proceedings or cannot make or assist in making his or her defense because of mental illness or defect.").

K.S.A. 2011 Supp. 22-3302 outlines the procedure for determining competency:

"(1) At any time after the defendant has been charged with a crime and before pronouncement of sentence, the defendant, the defendant's counsel or the prosecuting attorney may request a determination of the defendant's competency to stand trial. *If, upon the request of either party or upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial the proceedings shall be suspended and a hearing conducted to determine the competency of the defendant.*" (Emphasis added.)

When a defendant is charged with a felony and the conditions requiring a hearing are met, a district judge must conduct the competency hearing, with or without a jury within the judge's discretion, and may order a psychiatric or psychological examination of the defendant. K.S.A. 2011 Supp. 22-3302(2)-(3).

Although this court has not previously articulated the distinction, defendants may raise both procedural and substantive competency claims. A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing or the failure to hold an adequate competency hearing. A substantive competency claim alleges an individual was tried and convicted while, in fact, incompetent. *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001). Woods raises two procedural competency claims:

9

(1) the inadequacy of the pretrial competency hearing; and (2) the district court's failure *sua sponte* to hold a second competency hearing. He also makes a substantive competency claim, arguing he was in fact incompetent so the district court erred when it concluded otherwise.

Since Woods' appeal is the first time he raises a competency claim, we might typically consider first whether Woods' arguments were preserved. But the State is silent as to that question, so we will move on to the merits. See *Foster*, 290 Kan. at 702 (review warranted of district court's failure to *sua sponte* reconsider competency during trial even though raised for first time on appeal).

*Adequacy of the competency hearing*

Woods asserts he was entitled to a "more thorough competency hearing" in which the court should have specifically questioned him about his intellectual disability and his capacity to assist in his defense, noting he was prohibiting trial counsel from raising a mental disease or defect defense. He also argues the district court was required to ask how Woods could assist his attorney if he refused to take medication for schizophrenia. He contends these failures amount to a procedural due process violation. We disagree.

In *Medina*, the United States Supreme Court held the standard required for satisfying due process is whether the procedure "affords the criminal defendant . . . a reasonable opportunity to demonstrate that he is not competent to stand trial." 505 U.S. at 451. And although this court has not previously considered the type of procedural due process claim advanced by Woods—in which the defendant claims the competency hearing was inadequate—we have addressed whether our statute governing competency hearings is constitutionally adequate to protect a defendant's procedural due process rights. See *State v. Barnes*, 263 Kan. 249, 262-63, 948 P.2d 627 (1997).

10

In *Barnes*, the court held the framework provided by K.S.A. 22-3302 gives "ample opportunity" to demonstrate incompetence. This holding was in response to an argument that the statute deprived criminal defendants of a meaningful competency hearing because it does not require appointment of a psychologist to undertake a psychological evaluation or require an adversarial hearing. 263 Kan. at 262. The *Barnes* court stated:

> "[K.S.A. 22-3302] allows the defendant or his counsel to raise the issue and requires a hearing at which time the defendant is allowed to present evidence to establish his incompetence. The fact that the hearing may not afford the defendant the opportunity to cross-examine court-appointed physicians does not detract from his opportunity to demonstrate his incompetence. *We conclude that K.S.A. 22-3302 provides a defendant with a procedure which is adequate to protect his right not to be tried while incompetent*." (Emphasis added.) 263 Kan. at 263.

In Woods' case, the district court and the State initiated the competency evaluation despite Woods' protests against doing so. And after receiving an independent evaluation from COMCARE that concluded Woods was competent, the court held a competency hearing during which both sides had an opportunity to fully address the questions raised. Woods attended that hearing and informed the court he was familiar with the process and believed himself to be competent.

Woods argues the district court should have done more at the hearing to ascertain Woods' competence to stand trial and question the COMCARE evaluation's thoroughness. But those arguments go more to the next question, *i.e.*, whether the district court correctly determined Woods was competent to stand trial, rather than a procedural due process burden, which is clearly not imposed by K.S.A. 2011 Supp. 22-3302. Accordingly, since the district court complied with the statutory process that was constitutionally sufficient under *Barnes*, we hold the district court's procedure was adequate to satisfy due process.

11

*Woods' competency to stand trial*

When the district court initiates the competency issue, it is not a party and cannot be responsible for coming forward with the evidence of incompetence; but it can assign that burden to the State because both the court and the State have a duty to provide due process and a fair trial. The trial court measures the evidence presented by a preponderance of evidence standard. There is a presumption that the defendant is competent. *State v. Hill*, 290 Kan. 339, 367, 228 P.3d 1027 (2010) (citing *State v. Cellier*, 263 Kan. 54, 70, 948 P.2d 616 [1997]).

Appellate courts employ an abuse of discretion standard when reviewing a district court's decision about a defendant's competency to stand trial. *Hill*, 290 Kan. at 366; *State v. Kleypas*, 272 Kan. 894, 984, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004); *State v. Peckham*, 255 Kan. 310, 325, 875 P.2d 257 (1994); *State v. Perkins*, 248 Kan. 760, 767, 811 P.2d 1142 (1991); *State v. Soles*, 224 Kan. 698, 700, 585 P.2d 1032 (1978). Judicial discretion is abused if judicial action is:  (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *Fischer v. State*, 296 Kan. 808, Syl. ¶ 8, 295 P.3d 560 (2013).

Woods begins by challenging the COMCARE evaluator's conclusion that Woods was competent, stating "it is unclear how the COMCARE evaluation found that an intellectually disabled schizophrenic with an IQ between 55 and 60, and who refuses to take his medication, was competent to stand trial." But Woods is not per se incompetent

just because he was previously diagnosed with schizophrenia. See *State v. Harkness*, 252 Kan. 510, 516, 847 P.2d 1191 (1993). Moreover, Woods' argument slants the facts.

In the personal history summary, the COMCARE evaluator noted Woods previously had been diagnosed with schizophrenia but went on to conclude: "Woods *did not present with psychotic symptoms*." (Emphasis added.) The evaluator also stated, "While [Woods'] conversation was erratic at times, it was likely not related to psychotic symptoms or mood disorder, *but his effort to derail the process*." (Emphasis added.) And the evaluator did not indicate Woods needed to take medication or that the finding of competency was contingent upon Woods taking medication.

Woods also calls attention to what he characterizes as his "irrational decisions" that he argues demonstrate he was incompetent, namely his refusal to allow a mental disease or defect defense, not stipulating to his prior felony for the purposes of the criminal possession of a firearm charge, and his objection to a presentence evaluation regarding mental illness. But as the State correctly points out, the second and third events occurred after the competency hearing, so they are irrelevant to the present inquiry of whether the court abused its discretion when it found Woods competent to stand trial.

As to Woods' objection to presenting a mental disease or mental defect defense, this is not necessarily evidence of incompetence because there are other plausible explanations for the behavior. See *Harkness*, 252 Kan. at 516 (attacking court reporter, showing confusion and difficulty making decisions, and twiddling thumbs not necessarily signs of incompetency because there were other plausible explanations for defendant's actions). For instance, Woods' comments suggest a number of different explanations for his objection, including that he found the discussion insulting and wanted the criminal matter resolved. And these explanations were known to the evaluator, who specifically

13

noted Woods was "especially sensitive about [his mild mental retardation] diagnosis" and told the evaluator several times he was highly intelligent.

By the time of the competency hearing, the district court had observed Woods on several occasions and Woods was given an opportunity to explain why he objected to presenting a mental disease or defect defense. Woods' attorney characterized him as competent to stand trial but also indicated she believed he was suffering from mental illness. The competency evaluation concluded Woods had no psychotic symptoms or mood disorder but might have been attempting to "derail the process." In light of this, we hold the district court did not abuse its discretion by finding Woods competent to stand trial under a preponderance of the evidence standard.

*Reevaluating Woods' competency*

Under K.S.A. 2011 Supp. 22-3302(1) a judge has a duty to *sua sponte* inquire into a defendant's competency if the judge's own knowledge and observation provide a reason to believe the defendant is incompetent to stand trial. The determination of necessity for such a *sua sponte* inquiry is within the trial court's discretion. The party asserting the challenge bears the burden of demonstrating it. *Foster*, 290 Kan. at 703.

Woods argues his behavior obligated the district court to revisit its competency ruling. As evidence of this, Woods points to his continued refusal to present a mental disease or defect defense, his refusal to stipulate to a prior felony conviction for the purposes of proving the criminal possession of a firearm charge, and his conduct during voir dire and trial. We again fail to see an abuse of trial court discretion.

During voir dire, defense counsel informed the judge that Woods had yawned twice out loud. The court acknowledged it too had heard this. Counsel also indicated

14

Woods used Kleenex in water to wash his face and neck and then stuck torn tissue scraps into his ears. During trial, Woods laughed loudly enough the court reporter noted it during one witness' testimony. The court later admonished Woods for doing so, as well as yawning loudly.

We fail to see how the district court abused its discretion by not ordering a reevaluation of Woods based on these incidents. They were isolated and could easily be attributed to an attempt to derail the judicial process—a possibility noted in the COMCARE evaluation. Woods' actions, while unusual, did not rise to a level that demonstrates it was arbitrary, fanciful, or unreasonable for the district court to continue to rely on its previous competency determination. Woods was not speaking incoherently, responding to unseen stimuli, or otherwise behaving in a way that would suggest he had developed new symptoms requiring another evaluation. *Cf. McGregor v. Gibson*, 248 F.3d 946, 959 (10th Cir. 2001) (holding reasonable judge should have had a bona fide doubt about defendant's competence when, among other things, defendant had temper tantrum because his shirt did not have a pocket, complained of mental or medical problems, asked questions demonstrating potential disorientation, and challenged prospective juror to "one on one" basketball game).

In addition, it is noteworthy defense counsel did not raise concerns about Woods' competency after the initial hearing, even though the district court gave her an opportunity to make an additional record after Woods' yawning and laughing during trial. See *Drope v. Missouri*, 420 U.S. 162, 178, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) ("'Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client . . . an expressed doubt in that regard by one with 'the closest contact with the defendant' . . . is unquestionably a factor which should be considered.'"). Instead, Woods' attorney stated that she had informed him it was inappropriate to laugh. There is also some evidence in the record of

15

collaboration between defense counsel and Woods because she withheld her consent to admission of the State's exhibits until she shared them with her client.

We hold the trial court did not abuse its discretion by failing to *sua sponte* engage in another competency determination after its earlier conclusion that Woods was competent to stand trial.

WOODS' INTERVIEW WITH INVESTIGATORS

Before trial, Woods sought to suppress statements he made to the arresting officer, as well as statements made during a videotaped police interview. The district court held both were admissible. On appeal, Woods challenges only the statements made during the recorded interview with investigators, so that focuses our analysis. We conclude this challenge is without merit.

*Additional facts*

Following his arrest at the scene, Woods was taken to an interview room at the Wichita police station. He remained in that room from shortly after noon until 6 p.m., but the actual interview did not begin until around 3:20 p.m. and lasted about 90 minutes. Woods was handcuffed to a table during this entire time but was frequently released to go to the restroom and was provided with coffee and water on request.

The interviewing detective began by inquiring about Woods' personal history. Woods asked if he could "call my attorney." The detective responded, "You are welcome to an attorney if that is what you wish to do." Woods replied, "Well, yeah, I'm still trying to speak with you too because . . . I have to set up stuff for my wife with you because I'm her husband." The detective then explained that if Woods wanted an attorney the

16

detective was going to leave and let Woods talk to one. Woods then asked to call his mother. The detective said no calls to his mother would be allowed at that time but that Woods would get a phone call later.

The detective then asked whether Woods wanted to exercise his right to an attorney. Woods said, "But you not going to give me no information unless I cooperate with you, right?" The detective responded that he was not there to tell Woods what he knew but was there to get Woods' side of the story. The detective again tried to clarify Woods' desire for an attorney, and Woods repeated that he wanted to figure out what happened to his wife. Woods then affirmatively stated, "Don't worry about the lawyer." Responding to this, the detective asked whether Woods wanted an attorney and Woods answered, "No." The detective then repeated the question, and Woods again indicated he did not want an attorney. Woods said he would talk to the detective in the hope the detective would talk to him.

The detective then resumed gathering Woods' personal information. Woods said he was a high school graduate, gave his address, and responded to dozens of other background questions before the detective presented to him the *Miranda* waiver form. At that time, both read the form's provisions out loud and Woods initialed on the form the specific rights he agreed to waive. Woods again said he wanted to continue talking with the detective and signed the form.

Later in the recorded interview, Woods admitted he shot his wife at least twice. He believed he missed the first time and shot her in the head the second time while she was on the ground. He told the detective the killing was not premeditated and that he was not "plotting it." Woods said he decided to shoot his wife when she was standing in their yard yelling and cussing. He also said he "wasn't intending to kill nobody, but you never know with a gun. Guns kill people."

Woods gave a couple explanations for the shooting. He said he felt threatened because his wife was "calling . . . other people . . . to tell them to put their hands on me." When asked whether she threatened him with a weapon, he reiterated that "she threaten me with people." He also said he "just got fed up with the situation and . . . took it into my own hands." He said, "I felt the need. It was necessary." Woods explained his wife was behaving disrespectfully by taking property from their home, being secretive about where the kids were, and stealing his property.

In his motion to suppress, Woods argued that his statements during the interview were "obtained without a full, knowing, and intelligent waiver of rights under *Miranda*." The motion to suppress contended

> "[t]hat due to the physical, mental, educational, and emotional state of [Woods], he was unable to appreciate the full meaning of his rights under *Miranda*, and any waiver of relinquishment of such rights was not made by [Woods] voluntarily, knowingly, or intelligently, as required under *Jackson v. Denno*, 378 US 368 (1964)."

At the suppression hearing, Woods made a more specific argument that his statements were involuntary because he was unable to communicate with the outside world, citing the detective's statement that Woods could not make a phone call. He also noted he was in the interview room for 6 hours. He argued he had requested an attorney and only agreed to talk because he wanted information on his wife and kids. He again claimed those factors demonstrated his waiver of his rights was not knowing and voluntary. He did not specifically argue, as he does now on appeal, that "an intellectual disability and a serious, untreated mental illness prevented [him] from knowingly and voluntarily waiving his privilege against self-incrimination."

18

The district court denied the motion to suppress. It noted the actual interview lasted only about 90 minutes, Woods was in his late twenties, and he told police he had a high school diploma. The court also observed Woods had a significant criminal history and had previously invoked his right to silence on another occasion. The court found Woods understood the detective's questions and responded appropriately. It also described the interview process as "very fair" without any signs of coercion, threats, or intimidation. Regarding Woods' initial inquiry about an attorney, the district court held it was a back and forth discussion without coercion and that Woods freely concluded that he wanted to talk to the detective. Based on those findings, the district court held Woods' confession was the product of his free and independent will and was admissible.

At trial, Woods renewed his objection to the statements made during the taped interview "pursuant to pretrial motions." That objection was overruled based on the court's prior rulings. A continuing objection was made and noted.

*Standard of review*

The district court's decision on Woods' motion to suppress is subject to a dual standard of review. The factual findings are reviewed for substantial competent evidence, while the legal conclusion drawn from those facts is reviewed de novo. If there are no disputed material facts, the issue is a question of law over which the appellate court has unlimited review. *State v. Carlton*, 297 Kan. 642, 645-46, 304 P.3d 323 (2013).

*Discussion*

This court considers a nonexclusive list of factors when determining if a confession is voluntary under the totality of the circumstances, including: (1) the defendant's mental condition; (2) the manner and duration of the interrogation; (3) the

19

defendant's ability to communicate with the outside world; (4) the defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's proficiency with the English language. *State v. Harris*, 293 Kan. 798, 807-08, 269 P.3d 820 (2012). "Any one factor or a combination of factors '"may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act." [Citations omitted.]'" *State v. Betancourt*, 301 Kan. 282, 290, 342 P.3d 916 (2015).

Woods focuses on his mental condition and intellect. And in a related argument, Woods appears to claim that he wrongly believed he had to speak with police to get information about his wife and kids. But Woods again overstates the facts regarding his mental illness. The COMCARE competency evaluation noted Woods had been previously diagnosed with schizophrenia but concluded he was not psychotic when the evaluation was made. This evaluation, of course, occurred after the police interview; but the unredacted video, which the district court reviewed prior to ruling on the suppression motion, supports the conclusion that Woods easily understood the questions posed and answered appropriately. In short, there is no evidence Woods' responses were unknowing or involuntary because he was suffering from schizophrenia.

Regarding Woods' intelligence, there is conflicting evidence whether Woods completed high school. He told the detective he had graduated from high school, but the competency evaluation reported he had dropped out of school when he was 15 years old. The evaluation indicates Woods' IQ fell in the mild mental retardation range, and it is apparent from the video that Woods wanted to speak with detectives because he was hoping to learn something about his wife and kids. In this regard, he made several statements indicating he wanted information both before and after the interviewing detective explicitly told him the interview's purpose was to get Woods' story, not to

provide Woods with information. Woods appeared to continue harboring this belief even after the detective explicitly disavowed it.

But even if we assume Woods' low intelligence caused him to believe he was required to speak with the detective to learn about his wife's condition, this would be insufficient to render the confession involuntary without more. See *State v. Randolph*, 297 Kan. 320, 330, 301 P.3d 300 (2013) ("[I]t is well established that low intelligence alone does not preclude a finding that an accused knowingly and voluntarily waived his or her *Miranda* rights."). Woods must show he was coerced into confession. See *Colorado v. Connelly*, 479 U.S. 157, 163-65, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (low intellect not basis for finding statement involuntary if no coercion). And here there is no evidence of coercion or inducement. In fact, the detective explicitly told Woods the officers were not there to give information.

We hold that under the totality of the circumstances, the district court did not err by determining the confession was voluntary.

Finally, we must dispose of a passing remark in Woods' brief in which it might appear Woods shifts to an argument that he invoked his right to an attorney. He fleetingly contends his "references to a 'lawyer' should have been sufficient to conclude that he was invoking his right to an attorney." But there is nothing further said about there being an actual invocation of Woods' constitutional right to attorney or an error by law enforcement in not honoring this reference as a clear and unambiguous invocation of this right. See *Davis v. United States*, 512 U.S. 452, 458, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994) (right to counsel); *Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (if the suspect invokes *Miranda* during questioning, the interrogation must end); *State v. Cline*, 295 Kan. 104, 113, 283 P.3d 194 (2012) (suspect's invocation must be unambiguous, such that a reasonable police officer under

21

the circumstances would understand the statement as an assertion of a *Miranda* right). And at oral argument, Woods' appellate counsel made clear there was no issue on appeal that Woods had made a clear and unambiguous invocation of his right to remain silent. Therefore, this passing remark has no place in our analysis as a claim of error.

## LIMITING VOIR DIRE EXAMINATION

Woods argues next that the district court abused its discretion by prohibiting him from asking prospective jurors during voir dire whether they "have a history of mental illness, either individually, or someone close to them." Defense counsel argued this question was relevant, even though Woods was not raising a mental disease or defect defense, because Woods told the interviewing officers he was on disability and indicated the detective would have to speak with his psychiatrist to learn why. The court held defense counsel's proposed question was irrelevant because Woods was not raising a mental disease or defect defense. We hold that the district court acted within its discretion.

At trial, and over the State's objection, the district court allowed the jury to learn that Woods had told the interviewing detective he was on disability. But Woods' reference to a psychiatrist was never admitted into evidence. The district court indicated the State could introduce Woods' testimony that he was on disability, or it would allow defense counsel to address it on cross-examination. The prosecutor opted to introduce it on direct examination during the following colloquy:

> "Q. [The prosecutor]: Now, you've indicated that you received some personal history
> from Mr. Woods during the course of your interview with him. You indicated that he
> gave you his height, weight, that kind of general description, and you indicated that in
> advising him of his *Miranda* rights, you asked him some other questions. Did you ask

22

him regarding whether or not he'd had any mental issues in terms of just getting a personal history?

"A. [Detective]: Yes.

"Q. And what did he tell you?

"A. He said he was getting disability for disability services."

On appeal, Woods argues his voir dire was improperly restricted because "Woods was behaving like a schizophrenic who refused to take his medication." Woods cites his behavior during voir dire in which he wiped his face and placed tissue scraps in his ears. Woods also cites the detective's testimony that Woods was receiving disability.

K.S.A. 22-3408(3) governs voir dire, stating:

"The prosecuting attorney and the defendant or his attorney shall conduct the examination of prospective jurors. The court may conduct an additional examination. *The court may limit the examination by the defendant, his attorney or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose.*" (Emphasis added.)

This court has recited the following principles and standard of review for challenges to the scope of voir dire:

"'The "purpose of voir dire examination is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality." [Citation omitted.] Generally the nature and scope of the voir dire examination is entrusted to the sound discretion of the trial court. [Citation omitted.] However, "'[i]n determining whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate tribunals have the duty to make an

23

independent evaluation of the circumstances.'"'" *State v. Reyna*, 290 Kan. 666, 686, 234 P.3d 761 (2010).

The issue is whether defense counsel's question was irrelevant, *i.e.*, served no useful purpose, because mental illness was not an issue in Woods' case. The State rightly points out that the question framed by defense counsel could have been phrased in a less intrusive way. But even if the inquiry is viewed more broadly as a mechanism to unearth potential bias against people who suffer from mental illness, Woods cites no authority that the question was relevant. Woods simply states: "The defense needed to ensure that the jury would be fair and unbiased . . . towards a person with mental illness." But this misses the relevance question since Woods was not presenting a defense that he suffered from mental disease or defect.

No Kansas case is directly on point, although *State v. Simmons*, 292 Kan. 406, 254 P.3d 97 (2011), provides support for concluding the district court properly limited Woods' inquiry. *Simmons* involves a prosecutorial misconduct claim, but it is relevant for these purposes because the court concluded the prosecutor's discussion during voir dire of the Stockholm Syndrome was error because it was irrelevant.

In that case, the prosecutor asked potential jurors numerous questions about the Stockholm Syndrome, which concerns a hostage's attitude toward captors, and went so far as to urge jurors to view some of the trial evidence "in light of the Stockholm Syndrome." 292 Kan. at 410. On appeal, the defendant argued this inquiry was misconduct because it was irrelevant to discovering juror prejudice or bias since the State did not present any evidence about the syndrome or that the victim suffered from it. The *Simmons* court agreed because the prosecutor referred to facts that were never in evidence—a prohibition this court noted was applicable to all lawyers. 292 Kan. at 411; see also Rule 3.4(e) of the Kansas Rules of Professional Conduct ("A lawyer shall not . . .

24

[e] in trial, allude to any matter . . . that will not be supported by admissible evidence.") (2014 Kan. Ct. R. Annot. 620).

Similarly, the fact that Woods was previously diagnosed with schizophrenia and had received treatment was never in evidence. And the testimony about Woods receiving disability payments, which was admitted over the State's objection, was not enough to open the door because nothing was said specifically about why those payments were received. The district court did not abuse its discretion by refusing to allow the question because it was irrelevant.

SUFFICIENCY OF THE EVIDENCE OF FIRST-DEGREE MURDER

To convict Woods of premeditated first-degree murder, the State had to prove he killed his wife intentionally and with premeditation. K.S.A. 2011 Supp. 21-5402(a). Woods argues the State failed to present sufficient evidence of premeditation for a jury to reasonably convict him of first-degree murder. We disagree.

*Additional facts*

The evidence at trial showed that about a month and a half before the shooting Woods-Cratic decided to leave Woods and she had moved furniture and possessions into Jerry Johnson's home. Johnson was the father of Woods-Cratic's other children. She continued living with Woods, however.

At around 11:30 a.m. on the day of the shooting, Johnson dropped a child off at Woods' house so Woods-Cratic could take her to a basketball game. Johnson testified Woods-Cratic called him at 11:50 a.m. to tell him she could not go because she and

25

Woods were arguing. Woods-Cratic called back shortly thereafter to see if Johnson had made arrangements for the child and told Johnson that Woods was "trippin."

Shortly before noon, Quantinia Mahan Perry saw Woods-Cratic and Woods in front of their house. Woods-Cratic was on her cell phone asking someone to come get the car. Perry described Woods as "butting in" to Woods-Cratic's conversation. She described Woods-Cratic as mad and Woods as calm. Sometime after 12:15 p.m., Perry heard two bangs and saw Woods-Cratic fall in the middle of the street. Woods was standing between the curb and sidewalk, walking like he was going to go back in the house. Perry said Woods turned around and shot Woods-Cratic three more times in her neck. She described this as taking about 3 minutes, but then she said she was not sure how long it took.

Galashia Davis and Rose Trussell were at a nearby garage sale. Davis heard what she thought were firecrackers and saw Woods-Cratic running into the street and then falling down. Woods walked up to her feet, pointed the gun at her head, and pulled the trigger. Davis described Woods as having "tunnel vision." Afterwards, Woods stood in the yard talking on the phone. Davis described the shooting as a matter of seconds between pops or gunshots. Davis also testified that there were three children present, who were running next to Woods screaming and pulling on him while he walked up to Woods-Cratic and took the final shot. She said the children had absolutely no effect on him. It was as if he didn't hear them.

Trussell testified that she heard "pow pow" and saw Woods-Cratic close to the street. She heard another "pow pow" and watched Woods-Cratic run away. Woods-Cratic was telling Woods "you don't have to do this." She heard another "pow pow" and saw Woods-Cratic fall in the street. Woods then ran up to Woods-Cratic and fired point blank. Trussell described the shooting as happening quickly with three sets of "pows." She

26

testified the last shot was fired at close range while Woods had his gun pointed at Woods-Cratic's forehead. Afterwards, Woods stood in his yard talking on a phone.

Asia Cannon-Witherspoon was nearby at the Family Dollar parking lot. She heard a gunshot and saw Woods walking towards Woods-Cratic. Woods shot Woods-Cratic, and she fell in the street. Woods stood over her while she lay in the street and shot her again in the upper part of her body. Cannon-Witherspoon described the shooting as happening really quickly. Afterwards, Woods was walking around, and she heard him tell someone that he shot his wife.

Sophia Thomas was inside the home directly across the street. She did not hear anything before the shooting but testified she heard three gunshots and children crying. The shots were not right after each other. She heard one shot, and then a little bit of time passed before the next two shots, which were close together. Thomas went outside and saw Woods standing over Woods-Cratic. She testified, "All he could say was that's his wife, you know, like that made it right or something."

A Wichita police officer arrived within 1 minute of receiving a call from dispatch about the shooting. He saw Woods-Cratic lying in the street and several people standing around. He also saw Woods standing in his front yard staring at her body. Woods ran towards the Family Dollar. The officer ordered him to drop his weapon, and Woods complied. Woods was placed under arrest.

While the officer was putting Woods in a patrol vehicle, Woods heard the police radio traffic. The officer testified Woods said "her name is Ms. Woods. I just shot my wife," and, "I don't have anything. I just shot my wife." Woods also told the officer to get him out of there because people were going to kill him. When Woods overheard another officer's question about where the shooting started, he spontaneously responded that the

27

shooting started at his address. The officer described Woods as "very matter of fact," not angry or panicked.

*Standard of review*

"When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." *State v. Lloyd*, 299 Kan. 620, 632, 325 P.3d 1122 (2014).

*Discussion*

The jury was properly instructed that premeditation means:

"[T]o have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." PIK Crim. 3d 56.04(b).

This court has held that premeditation indicates a time of reflection or deliberation. It does not necessarily mean an act is planned, contrived, or schemed beforehand. The following factors can be considered when determining whether the evidence supports an inference of premeditation: (1) the nature of the weapon used; (2) the lack of provocation; (3) the defendant's conduct before and after the killing; (4) any threats or declarations of the defendant before or during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless. The analysis is not driven by the number of facts supporting a finding of premeditation because

28

sometimes one factor may be compelling evidence of premeditation. *Lloyd*, 299 Kan. at 633.

Woods argues application of these factors supports his argument that there was insufficient evidence of premeditation. He contends the State did not show Woods threatened Woods-Cratic; "the events leading up to the shooting occurred in a quick period of time"; Woods shot Woods-Cratic in front of many witnesses; and his behavior after the shooting does not suggest premeditation because he watched her body until he was arrested, admitted to witnesses that he shot his wife, and did not deny his guilt.

The State counters that Woods misapplies the standard of review by citing evidence he believes conflicts with the verdict instead of considering the evidence which supports it. The State argues there is sufficient evidence for a rational factfinder to conclude Woods premeditated the killing because he fired a gun multiple times at close range—with the final fatal shot occurring while the victim was lying defenseless on the ground. The State's argument has merit.

Woods-Cratic was shot three times with the only immediately fatal shot being the one to her head. The evidence is undisputed that Woods fired that shot last. Perry, Davis, Trussell, and Cannon-Witherspoon all testified to the following sequence of events: Woods began shooting; Woods-Cratic ran into the street and fell; then Woods walked up and shot her in the head at close range. And this series of events was confirmed by Woods' statement during the videotaped police interview, which was played for the jury, that he shot Woods-Cratic in the head while she was on the ground. And Woods said he had decided to shoot her "when she was in the yard yelling and cussing."

Most witnesses described the shooting as happening quickly but still indicated there was sufficient time to form premeditation during the time Woods stepped off the

curb, approached Woods-Cratic, and fired the fatal shot at her head. While there is additional evidence supporting the jury's finding of premeditation, the fifth factor—dealing a lethal blow after the victim was felled and rendered helpless—is adequate by itself to uphold the jury's verdict under the facts in this case.

LESSER INCLUDED OFFENSE INSTRUCTIONS

Woods argues next that the evidence supported an instruction on voluntary manslaughter under a sudden quarrel or heat of passion theory, as a lesser included offense of first-degree murder. We disagree.

The framework for analyzing jury instruction issues was established in *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012):

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)."

Woods preserved this issue by requesting the instruction during the jury instructions conference. See K.S.A. 2011 Supp. 22-3414(3) (defendant must distinctly state an objection to the omission before the jury retires to consider its verdict). And this instruction is legally appropriate because voluntary manslaughter is a lesser included

30

offense of first-degree murder. *State v. Story*, 300 Kan. 702, 710, 334 P.3d 297 (2014). The only issue is whether the instruction was factually appropriate.

A defendant is entitled to instructions on the law applicable to his or her defense theory if there is sufficient evidence from which a rational factfinder could find for the defendant on that theory. An appellate court views the evidence that would support that instruction in a light most favorable to the defendant. 300 Kan. at 710. But the court will not speculate about hypothetical scenarios. "'For a lesser included offense to be factually appropriate, there must be actual evidence in the record, together with reasonable inferences to be drawn from that actual evidence, that would reasonably support a conviction for the lesser included crime.'" 300 Kan. at 710 (quoting *State v. Wade*, 295 Kan. 916, 926, 287 P.3d 237 [2012]).

An intentional killing and legally sufficient provocation are the key elements of voluntary manslaughter under K.S.A. 2011 Supp. 21-5404(a). *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014). An objective test is used to review whether the provocation is legally sufficient. 299 Kan. at 418. "Heat of passion" is "any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror," based "on impulse without reflection." *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985). But the provocation "must be sufficient to cause an ordinary man to lose control of his actions and his reason." 236 Kan. at 796.

Woods first argues the district court improperly analyzed his request because it weighed the evidence supporting the instruction against opposing evidence. But he cites the district court's initial comments before it solicited argument from counsel and omits reference to the district court's actual ruling, which the court made after recessing to review several cases cited by the State.

In its consideration of Woods' request for a voluntary manslaughter instruction, the district court began by reciting evidence it believed "weigh[ed] against that instruction." This was principally subjective evidence of Woods' actions and comments both before and after the shooting. The court then recited "factors weighing for giving" the voluntary manslaughter instruction, which included evidence of an argument between Woods and his wife about property and the kids. But after hearing argument from counsel, the court recessed to review several cases the State presented on provocation.

When the proceedings resumed, the court recited the correct objective standard for reviewing provocation and noted the provocation must be severe or "calculated to deprive a reasonable person of self-control." It then concluded the evidence showed Woods was obviously upset but found there was nothing qualifying as a sufficient provocation, such as an assault, weapons, or physical threats what would cause a reasonable person to kill Woods-Cratic. In short, the district court applied the correct standard when determining Woods was not entitled to a voluntary manslaughter instruction.

Woods' remaining argument is that the district court erred in finding evidence of provocation lacking. He notes the following evidence supported a voluntary manslaughter instruction:  Woods and his wife were arguing on the front lawn before the shooting; his wife was leaving Woods and moving in with another man; Woods' family was breaking up on his second wedding anniversary; Woods' wife said Woods was "trippin"; one witness testified Woods was "butting in" to his wife's phone conversation; and Woods "does not appear to hear the children's cries not to harm [Woods-Cratic]."

But this last assertion regarding the children's cries does not demonstrate an objective basis for finding Woods acted in the heat of passion. It speaks to Woods' emotional state of mind. See *Story*, 300 Kan. at 711 (defendant's emotional state of mind does not demonstrate objective basis for instruction on heat of passion). And the

remaining evidence, which at best amounts to a verbal confrontation, is insufficient to warrant a voluntary manslaughter instruction because it is not enough to cause an ordinary person to lose control of his or her actions.

Viewing the evidence in a light most favorable to Woods, it demonstrates only that the couple were arguing and that Woods-Cratic was removing property from their home—as she had done 3 weeks prior to the killing. The district court correctly held there was no evidence of physical assault or a weapon. We hold that the voluntary manslaughter instruction was not warranted because there was no objective evidence of a provocation sufficient to support issuing that instruction.

## CUMULATIVE ERROR

Since we hold there was no error, a cumulative error analysis is not appropriate. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009) (cumulative error doctrine does not apply if no error or only one error supports reversal).

## WOODS' REGISTRATION AS A VIOLENT OFFENDER

During sentencing, the district court ordered Woods to register as a violent offender under the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 *et seq.* In doing so, it did not pinpoint the particular statutory subsection it was relying upon; but the court stated, "I will order registration as a violent offender based on Count 1, murder in the first degree, *obviously a person felony committed with a firearm.*" (Emphasis added.) The sentencing journal entry indicates Woods is required to register as a violent offender because he was convicted of first-degree murder.

The sentencing judge also had Woods sign a document entitled "Notice of Duty to Register." The district court explained to Woods that he would be required to register under KORA "if you ever do get out of the prison system" and explained the registration requirement would be different from parole. The form is not included in our appellate record, but it appears to be a mechanism for fulfilling the sentencing court's duty to "[i]nform any offender, on the record, of the procedure to register and the requirements of K.S.A. 22-4905, and amendments thereto" under K.S.A. 2011 Supp. 22-4904(a)(1).

On appeal, Woods challenges the KORA registration requirement on two grounds. First, he argues the registration order was a punishment imposed after an unconstitutional judicial factual finding that he used a deadly weapon in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Second, Woods argues the form he signed was a void and unenforceable contract given his "severe intellectual disability and mental illness."

As to the first issue, we need not decide whether KORA factual findings violate *Apprendi*. Under K.S.A. 2011 Supp. 22-4906(a)(1)(F), all defendants convicted of first-degree murder must register. That statutory subsection does not require a district court finding that the crime occurred with a deadly weapon. And although the district court's reference to a firearm suggests it was imposing registration under K.S.A. 2011 Supp. 22-4906(a)(1)(L) ("conviction of any person felony and the court makes a finding on the record that a deadly weapon was used in the commission of such person felony"), the district court was obligated nonetheless to impose a registration requirement based on the conviction itself. See K.S.A. 2011 Supp. 22-4906(a)(1)(F).

As to Woods' argument that the notice is a void contract, this contention is without merit. The notice itself was not included in the appellate record, which makes it impossible to examine its provisions; but even so, the district court's comments make

34

clear the notice was simply a form it used to notify Woods that he will be obligated to register as a violent offender if he is ever released from prison as required by K.S.A. 2011 Supp. 22-4904(a)(1).

Affirmed.