NOT DESIGNATED FOR PUBLICATION

No. 112,711

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NICHOLAS ALLEN COX,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Opinion filed July 8, 2016. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Andrew Hamline*, intern, *Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., POWELL and GARDNER, JJ.

*Per Curiam*:  Nicholas Allen Cox appeals his conviction and upward durational departure sentence imposed after a jury found him guilty of aggravated battery. On appeal, he argues that the district court erroneously admitted evidence at trial and improperly instructed the jury. He also argues that the district court should have impaneled a different jury to decide the upward departure factors and should not have granted the State's motion for an upward departure sentence. We find none of Cox's arguments to be meritorious. Thus, we affirm.

1

FACTS

At approximately 9:15 p.m. on October 6, 2011, Katherine Kirk arrived home where Cox, her ex-husband, had been watching their two children while she was at work. Cox came out the front door and told her to go inside so he could show her something. Once inside, Cox asked Kirk to look at something on the computer. Before she could see what was on the screen, however, Cox punched her in the face.

Cox continued to beat Kirk—hitting her with his hands and kicking her with his feet all over her body—for several hours. Evidently, the children were asleep inside the house throughout the incident. On several occasions, Kirk lost consciousness. Once she regained consciousness, Cox would start beating Kirk again. At some point, the beating caused Kirk to defecate, and Cox dragged her into the bathroom to wash herself off.

Following the incident, Cox took Kirk to her bedroom. He put her onto the bed and got into bed with her. Once she was sure that Cox was asleep, Kirk crawled to a neighbors' house because she could not walk. She knocked on her neighbors' door at approximately 3:30 a.m., but the neighbors did not recognize Kirk's appearance because of the injuries to her face. They were, however, able to recognize her voice, so they let her into the house. After one of the neighbors called 911, the police arrived at Kirk's house and found Cox asleep in her bed.

While sitting in the back of a police car on the way to the detention center, Cox voluntarily made several statements that were recorded on video. Specifically, Cox asked the officers what he was being charged with and argued that he should be charged with battery instead of aggravated battery because there was no great bodily injury, which required "more than deep bruising." Cox asked what was wrong with Kirk and stated that he did not do anything to her that could be considered aggravated battery.

Kirk was taken to Overland Park Regional Medical Center by ambulance. After initially being seen in the Emergency Room, she was admitted as an inpatient. At the hospital, Kirk was diagnosed to have suffered significant swelling and bruising on her face, back, and legs. She had a cut under her left eye that required 19 stitches and an injury to her left breast that appeared to be a bite mark. Kirk's second, third, and fourth lumbar vertebral body were fractured. Kirk spent a week in the hospital. She could not use the restroom by herself for the first 4 or 5 days, and she could not eat solid food or feed herself for the first 5 or 6 days.

Although she was released from the hospital after a week, Kirk was unable to drive and could not sit for more than 20 minutes. She needed help walking. She was unable to work for a month and had to do physical therapy for pain in her wrists that lasted about a year. She has a permanent scar from the cut on her face and, at the time of trial, still had intermittent back pain and panic attacks.

On October 7, 2011, the State charged Cox with one count of aggravated battery. Shortly thereafter, Cox invoked his right to represent himself. Although the district court allowed Cox to represent himself, it appointed an attorney who had previously represented him to serve as standby counsel. The district court also accepted Cox's waiver of preliminary hearing and bound him over for trial on the charge of aggravated battery. On the same day, the State filed both a notice of its intent to seek an upward departure and a motion for an upward departure.

There were several continuances over the next 2 years. Moreover, on December 30, 2011, the district court ordered Cox to go to Larned State Hospital for an evaluation pursuant to K.S.A. 22-3219. However, he was subsequently found to be competent to stand trial. On February 28, 2014, the district court held a pretrial hearing, in which several issues were considered. At the hearing, the district court denied Cox's request to have a different jury determine the upward departure factors asserted by the State. The

3

district court also ruled prior to trial that evidence of Cox's prior crimes—in which Kirk was the victim—was inadmissible under K.S.A. 2015 Supp. 60-455.

A 4-day jury trial began on March 4, 2014, at which Cox was represented by legal counsel. Prior to empaneling a jury and outside the presence of the prosecutor, defense counsel explained to the district judge that although the district court had ruled that evidence of Cox's prior crimes could not be admitted into evidence at trial, his client believed it was necessary to talk about them at trial because the same jury would be used to determine the upward departure factors asserted by the State in the event that he was convicted.

During opening statements, the State alleged that the issue for trial was not whether Cox was the person who beat Kirk but whether her injuries were severe enough to constitute great bodily harm. Although defense counsel did not deny that his client had battered Kirk, he argued that the evidence would show that Cox was very intoxicated and could not remember what he did. Moreover, defense counsel argued that Kirk's injuries were not as extensive as the State claimed.

The State's first witness was Kirk's neighbor, who testified about Kirk knocking on her door at around 3:30 a.m. on October 7, 2011. She testified about Kirk's appearance and demeanor that night. Specifically, she testified that "[b]oth of her eyes were swollen shut, her face was bleeding. She was—her back was severely injured, she could not comfortably lay down by herself. It took a while to get her in a spot where she was somewhat comfortable. It was bad." A recording of the 911 call was admitted into evidence and played for the jury. Several officers and detectives from the Overland Park Police Department testified about their investigation of the case, and photographs of Kirk's injuries and the house were admitted.

4

Before Kirk testified, the State made a record out of the jury's presence that it was not going to bring up Cox's prior crimes when questioning Kirk and that if Cox brought it up, it was his own choice to do so. Kirk testified on direct examination about the events that occurred that night and the injuries she sustained.

On the second day of trial, Kirk's testimony was interrupted in order to present the testimony of two physicians who had treated Kirk at the hospital shortly after she was brought there. During one of the physician's testimony, a video showing Kirk's injuries was admitted into evidence.

After the two physicians testified, defense counsel told the district court that his client did not believe he had sufficiently cross-examined the two physicians, so Cox wanted him to subpoena them so they could be recalled. Cox's attorney also stated that his client wanted to represent himself. In addition, Cox requested a mistrial, arguing that the ruling denying his motion for a separate jury to consider the upward departure motion significantly altered his trial strategy. The district judge stated that he had ruled that the K.S.A. 2015 Supp. 60-455 evidence was inadmissible, and there was no reason for it to come in through the defense. The district court also stated that the physicians had already been released from their subpoenas. In addition, the district court denied the motion for mistrial, and Cox eventually agreed to have his attorney continue to represent him.

Defense counsel then resumed his cross-examination of Kirk, asking her whether this was the first time she and Cox had been in this kind of situation. After Kirk responded that it was not the first time, defense counsel asked her about an incident in 2009 where she suffered a nose injury. Kirk was also asked about the State getting involved in the custody of her children after both the 2009 incident and the current incident. According to Kirk, the custody issues had been resolved prior to the time of trial. Kirk also testified that she did not feel like she was under stress as a result of the custody issues. After defense counsel finished cross-examining Kirk, he made a record

5

outside the presence of the jury regarding the questions Cox wanted him to ask Kirk about the 2009 incident. Once again, the district court denied the request as irrelevant to the issues presented at trial.

Overland Park Police Detective Laurie Bridges testified next. She had recorded the initial video at the hospital showing Kirk's injuries. Detective Bridges testified that she also interviewed Kirk on October 11, 2011, and indicated that Kirk had told her that Cox "'just snapped'" on the night of the incident. Further, Detective Bridges testified that Kirk told her that she knew by the way Cox was snoring that he was either intoxicated or "on something." However, law enforcement did not do a breathalyzer or blood draw on Cox to determine his level of impairment.

Kirk's mother, Christina Kirk, testified next. She recounted her memory of receiving a phone call during the middle of the night. After receiving the call, Kirk's mother went to the neighbors' house to see her daughter. According to the mother, Kirk was unrecognizable when she first saw her following the incident due to the injuries to her face.

The State then asked the district court to rule on the admissibility of a redacted video taken from the police car while Cox was being transported to jail after the incident. As the State pointed out, the district court had already ruled that the statements Cox made in the police car did not violate *Miranda* and were not coerced. Moreover, the State argued that the video was relevant to Cox's defense that he was so intoxicated on the night of the incident he could not remember what happened. Defense counsel objected to the video's admission, arguing that Cox made statements to the police that were more prejudicial than probative. Although the district court initially denied the State's motion to admit the redacted video because Cox had not testified, it ultimately decided to admit the video into evidence because the next witness was the police officer who had transported Cox when he made the statements.

6

Overland Park Police Officer Leonel Hurst was in the police vehicle that transported Cox from his home to the detention center on October 7, 2011. He was the passenger while another officer drove the vehicle. The vehicle was equipped with a camera that recorded both audio and video during the ride. Officer Hurst testified that neither he nor the officer who was driving asked Cox any questions during the drive. The district court admitted over defense counsel's objection the redacted video recording showing portions of the ride to the detention center and played it for the jury.

In the portions of the video shown to the jury, Cox asks the police officers what he is being charged with. When one of the officers tells him he is being charged with aggravated battery, Cox states that he should only be charged with battery because he did not cause great bodily injury to Kirk. He also defines great bodily injury as "more than deep bruising." Later, he tells the officer, "When you realize you've been eating the pussy that's had cum in it for the last fucking four months, you get kind of mad. Just to let you know. It hurts." He then complains again about being charged with aggravated battery.

After the video was played, the State resumed questioning Officer Hurst who testified that he took photographs of Cox's hands once they got to the detention center because Cox had said to him, "'Obviously, I used my hands.'" On cross-examination, Officer Hurst testified that he did not think Cox was asking the questions he asked because he was trying to figure out what had happened that night. Moreover, Officer Hurst testified that he did not observe Cox exhibiting any effects of intoxication. After this testimony, the State rested.

The district court denied Cox's request to dismiss the aggravated battery charge, finding that the State presented a prima facie case to support the charge in its case in chief. Thereafter, Cox called six witnesses, including himself and Kirk. The first witness was his grandmother, who testified that she saw Kirk quite often after the incident and she never complained to her about back problems. According to the grandmother, Kirk

never complained about a scar on her face, and she did not notice any scars on Kirk's face.

Defense counsel then asked for permission to recall Kirk as a witness. He indicated that he wished to ask her questions about prior incidents of violence between Cox and Kirk that occurred between 2006 and 2009. Specifically, Cox asked to present evidence of things Kirk said to investigators back in 2009 in order to prove that she was "burnishing the extent of her injuries, saying she has this scar, saying she can't lift anymore, and that her back hurts all the time . . . ." Cox also thought there might be some testimony regarding pressure to testify a certain way based on issues with her children's custody. Ultimately, the district court determined—over the State's objection—that the door had been opened in K.S.A. 2015 Supp. 60-455 as to the 2009 incident and that Cox's attorney could recall Kirk to the stand and that he would be given some leeway in asking about those incidents to some degree.

Upon returning to the witness stand, Kirk was asked if the 2011 incident was the first domestic violence between Cox and her. She said no—there were also a couple of previous incidents. Without going into details about it, Kirk testified that the first incident occurred in 2006. After another incident of domestic violence in 2009, SRS got involved, and Kirk's oldest daughter, who was not Cox's child, was interviewed at Sunflower House. Kirk had to meet certain criteria to show she was capable of appropriately caring for her children. She further testified that there was a Child in Need of Care (CINC) case—that lasted about a year—which started in 2009.

According to Kirk, she had to testify at Cox's preliminary hearing after the 2009 incident, and she testified then about how she started having panic attacks in 2009 after that incident. But she testified that she only had one or two a year before the 2011 incident. Moreover, she testified that after the 2011 incident the panic attacks "came back full-fledged." Kirk also testified that she may have said back in 2009 that she was anemic

8

and bruised easily, but she was 7 months pregnant at the time and she was anemic during each of her pregnancies.

Cox testified next, and he admitted that he caused the injuries Kirk sustained on the night of October 6 and in the early morning of October 7, 2011. During his testimony, Cox admitted that he was convicted of two domestic batteries—in which she was the victim—as well as two convictions for violations of protection from abuse orders in 2006—again, with Kirk as the victim. As a result, he served approximately 3 years before being released.

Cox gave his version of the first incident of domestic violence in 2006, which he indicated occurred after he could not get money out of their checking account. During an argument over the money, he grabbed Kirk's neck. Later that night he was arrested and charged with domestic battery as well as domestic assault. Cox then testified about a protection order violation before testifying about another incident of domestic violence in 2006. He further testified about a 2009 incident of domestic violence—following his release from prison—during which he broke into her house and "caught her nose with the top of [his] head and she got a bloody nose." He then proceeded to bite Kirk's back. Following this incident, he went to prison again and was released in 2011.

Cox testified that on the night of October 6, 2011, after putting his daughters to bed, he looked at Kirk's computer and saw a message from a man, insinuating that Kirk was "getting action on the side." He claimed that this made him very angry and he began drinking alcohol with the intent to drink enough to pass out so that he would not do anything he regretted. He indicated that he drank a bottle of wine and most of a bottle of whisky. According to Cox, the last thing he remembered from that night was re-reading the email that had made him upset. The next thing he remembered was being woken up by the police the next morning.

Regarding the statements he made on the video from the police car, Cox testified that he did not know what he had done and was simply trying to figure out what happened. He testified that he knew the elements of the crime of aggravated battery because he had been charged with it before. He testified that he did not believe he had done anything and that it was the police officers who told him Kirk was bruised so that was why he did not think he should be charged with aggravated battery.

The State cross-examined Cox on the third day of trial. The prosecutor began by asking him about the 2006 incident when he had grabbed Kirk around the neck. The State also asked Cox about the violations of the protection from abuse orders. Cox indicated that he was released from custody in February 2009, and the next incident of domestic violence occurred August 31, 2009. The State asked about phone calls Cox had placed from jail to Kirk and to her mother following the incident asking them to testify on his behalf and appearing to threaten Kirk if she did not do so. Following his conviction, Cox returned to prison until June 2011.

After testifying on redirect examination about originally representing himself in this case and being transferred to Larned to get some mental help, defense counsel had a copy of the email that Cox claimed he read on the night of the incident admitted into evidence. Finally, Cox testified that Kirk had always complained about her back.

The next two witnesses for Cox were a high school friend of Cox's, who testified about Cox's low alcohol tolerance, and one of Cox's cousins who had seen Kirk several times after the incident, including once about a year before trial, and who testified that Kirk's physical condition seemed fine.

A forensic pathologist, Thomas Young, M.D., testified that he examined Kirk's medical records, photographs, and other information regarding the injuries she suffered in October 2011. Although he described Kirk's injuries as being "horrible," he testified that

10

Kirk's injures were primarily to the soft tissue. He testified that the injuries to her back were consistent with the history of assault from blunt force. According to Dr. Young, Kirk's injuries had primarily healed after the 5 days she spent in the hospital. His ultimate opinion was that "'the injuries sustained, as horrible as they were, did not and will not result in any significant permanent physical consequences.'" He testified that his opinion was based on articles given to him by Cox through defense counsel. On cross-examination, Dr. Young admitted that he had never met with Kirk.

Next, the parties agreed to admit a portion of an audio recorded by one of the officers who arrested Cox in the bedroom. Defense counsel then played the first 15 minutes of that recording for the jury. Afterward, based on comments made in the recording, which is not part of the record on appeal, defense counsel recalled Cox to the stand. Thereafter, the defense rested.

At a jury instruction conference, Cox requested that the jury be instructed on the lesser included offense of reckless aggravated battery and that the jury be given an instruction on sympathy. He also proposed a modified voluntary intoxication instruction that was different from the instruction in PIK Crim. 4th. The district court declined to give the requested instructions.

Following the jury instruction conference, the attorneys presented their closing arguments to the jury. After the district court read the jury instructions, the jurors began their deliberations. Because the jurors had not reached a verdict, they returned the following morning to resume deliberations. After the jury returned a verdict of guilty on the charge of aggravated battery, it was seated to hear evidence regarding the State's upward departure motion.

After the attorneys made opening statements, two presentence investigation reports were admitted into evidence. Moreover, the district court told the jurors that they

11

could also consider all the evidence heard during trial. Defense counsel then called Cox to the stand, and he testified about his prior criminal history. He testified that he had been in the county jail for 29 months already in the current case and that he had accepted that what he did was wrong.

Cox further testified that he was sent to Larned and got medication after he was "diagnosed with PTSD and some other stuff." He stated that he read the Bible every day and worked on a parenting plan. He also indicated he was participating in "AA" and "NA." In addition, Cox testified that he saw a psychologist and psychiatrist once a month. According to Cox, he was never violent toward his children or to anyone else other than Kirk. He testified that he had no intention to get back together with Kirk after he served his sentence in this case. He indicated that he was asking the district court to sentence him within the guidelines range or lower.

On cross-examination, Cox admitted that after his 2006 convictions for domestic battery, he had claimed he had stopped drinking and would not see Kirk anymore. He claimed, however, that Kirk came to visit him while he was incarcerated and continued to have a relationship with him for those 32 months. Cox admitted, however, that his next conviction, which was for aggravated battery of Kirk, came less than a year after he was released from prison in 2009. Moreover, he admitted that he was released from prison in that case in June of 2011 and that the current offense happened while he was still under supervision on his earlier conviction.

After the defense rested, the district court instructed the jury that the State had the burden to prove the aggravating factors beyond a reasonable doubt. The parties then made their closing arguments, and the case was presented to the jury. After deliberations, the jury returned a verdict finding beyond a reasonable doubt that Cox presented a risk of future dangerousness to the public safety.

Following trial, Cox filed several motions. At a sentencing hearing held on June 19, 2014, the district court denied Cox's motion for a new trial as well as his motion for a downward departure sentence. In addition, the district court granted the State's motion for an upward departure based on Cox's future dangerousness as found by the jury. Accordingly, the district court sentenced Cox to 208 months' imprisonment.

ANALYSIS

*Admission of Video Recording*

On appeal, Cox contends that the district court erred in admitting into evidence at trial a redacted video taken in the police vehicle while he was being transported to the detention center on the morning of October 7, 2011. Specifically, Cox argues that the comments made by him that are heard on the video were unduly prejudicial and had little probative value. In response, the State argues that the district court did not abuse its discretion in ruling that the probative value of these statements outweighed the risk of unfair prejudice.

Generally, all relevant evidence is admissible at trial. K.S.A. 60-407(f). However, a district court has the discretion to exclude otherwise admissible evidence if it finds that the evidence's "probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered." K.S.A. 2015 Supp. 60-445. Although the statute only mentions the evidence of surprise, district courts also have the discretion to exclude evidence that is unduly prejudicial. See *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013).

Undue prejudice "turns not on whether the evidence is damaging but on whether the evidence is likely to contribute to an improper jury verdict or distract from the central

13

issues at trial." *State v. Dern*, 303 Kan. 384, 395, 362 P.3d 566 (2015). We review the district court's determination regarding whether the probative value of evidence outweighs its potential for producing undue prejudice under an abuse of discretion standard. 303 Kan. at 394.

> "Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

Whether evidence is probative is an issue in determining its relevance. Evidence is probative if it has any tendency in reason to prove a fact. We likewise review a district court's determination that evidence is probative for abuse of discretion. See *State v. Boleyn*, 297 Kan. 610, 622, 303 P.3d 680 (2013).

Here, a review of the redacted video reveals that it is probative regarding the truthfulness of Cox's assertion that he was so intoxicated on the night of the incident that he did not know what he was doing and that he had no recollection of causing physical harm to Kirk. In fact, Cox is able to explain to the police officer why he believes he should only be charged with battery rather than aggravated battery. Moreover, he is able to articulate to the officer—albeit in quite vulgar terms—his alleged justification for causing physical harm to Kirk that night. Accordingly, we find the redacted video containing statements made by Cox immediately following his arrest to be both relevant and probative. See *State v. Abu-Fakher*, 274 Kan. 584, 598, 56 P.3d 166 (2002).

Cox argues that because the video was taken in the early morning hours, it does not have a tendency to prove whether he was intoxicated at the time he committed the

offense. It is important to note, however, that the evidence presented at trial shows that the offense was committed over the period of several hours and that Cox was arrested shortly after Kirk was able to crawl to her neighbor's house for help. State argues that an actual video recording of Cox's actions and statements made immediately following his arrest are very probative as to the credibility of his claim of intoxication. Moreover, as the State points out, the beating occurred over the course of several hours and the jury was aware of the timeline. And the statements are probative to the issue of whether Cox remembered what he did earlier in the day, even if he had since sobered up.

Although the redacted video contains profanity, these are the words Cox chose to use and we do not find them to be unduly prejudicial. Moreover, from viewing the record in this case, we find that it is unlikely that the video contributed to an improper jury verdict. Nor do we find that the video was likely to have distracted the jury from the central issues at trial. After all, Cox did not deny the he caused the injuries suffered by Kirk—injuries that were called "horrible" by Cox's own expert. Accordingly, we conclude that the district court did not abuse its discretion in admitting the redacted video into evidence.

*Jury Instructions*

Cox next contends that the district court erred in failing to give three specific jury instructions. First, he claims that the jury should have been instructed on reckless aggravated battery as a lesser includable offense. Second, he argues that it was error for the district court not to give the jury an instruction on sympathy. Third, he argues that the district court should have given the jury an instruction on voluntary intoxication.

Because Cox requested each of these instructions and the district court declined to give them, our review is unlimited. See *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015). At the outset, we must determine whether each instruction was legally

15

appropriate and, if so, we must determine whether there was sufficient evidence—viewed in the light most favorable to Cox—that would have supported giving the instruction. Finally, if we determine that the giving of a particular instruction was legally and factually supported, we must determine whether the error was harmless using the factors set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). See *Woods*, 301 Kan. at 876.

    1. *Reckless Aggravated Battery Instruction*

Cox was convicted of committing aggravated battery under K.S.A. 2011 Supp. 21-5413(b)(1)(A), which is a level 4 person felony, and required knowingly causing great bodily harm or disfigurement to another person. See K.S.A. 2011 Supp. 21-5413(g)(2)(A). The district court also instructed the jury on two lesser included offenses: aggravated battery under K.S.A. 2011 Supp. 21-5413(b)(1)(B), which is a severity level 7 person felony and required knowingly causing bodily harm to another in any manner whereby great bodily harm can be inflicted; and battery under K.S.A. 2011 Supp. 21-5413(a)(2), which is a person misdemeanor and required knowingly causing great bodily harm to another person. See K.S.A. 2011 Supp. 21-5413(g)(1), (g)(2)(B). However, Cox contends that the jury should have also been instructed on reckless aggravated battery. See K.S.A. 2011 Supp. 21-5413(b)(2)(A) and K.S.A. 2011 Supp. 21-5413(b)(2)(B). In addition, he contends that an instruction regarding the definition of reckless conduct under PIK Crim. 4th 52.010 should have been given to the jury.

Certainly, there are instances in which reckless aggravated battery can be a lesser included offense of aggravated battery. See *State v. McCarley*, 287 Kan. 167, 177-78, 195 P.3d 230 (2008) (finding that reckless aggravated battery is a lesser included offense of intentional aggravated battery because it is a lesser degree of the same crime). Nevertheless, we do not find that the giving of a reckless aggravated battery instruction was factually appropriate in this case. "A person acts 'recklessly' or is 'reckless,' when

16

such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2015 Supp. 21-5202(j). In contrast, a person acts knowingly when the person "is aware of the nature of such person's conduct or that the circumstances exist" and "is aware that such person's conduct is reasonably certain to cause the result." K.S.A. 2015 Supp. 21-5202(i).

The focus of Cox's argument that his actions were reckless was on his actions that occurred *before* Kirk arrived home. Specifically, Cox claims that he consciously disregarded a substantial and unjustifiable risk when he knew he was becoming angry after reading the email and opted to drink heavily. There is nothing in the record to suggest that Cox drank *after* Kirk got home nor is there anything in the record to suggest that he did anything other than knowingly hit and kick her repeatedly over the course of several hours. Hence, the record does not show any evidence that the aggravated battery on Kirk was the result of a conscious disregard of a substantial and unjustifiable risk that Kirk would be harmed by his actions.

To support a reckless aggravated battery instruction, the evidence needed to show that Cox's action toward Kirk was reckless. Quite simply, there is nothing in the record to suggest that Cox's aggravated battery of Kirk was done recklessly. Rather, the evidence reveals that after Kirk got home on the night of the incident, he knowingly beat her until she would be rendered unconscious and then started beating her again as soon as she regained consciousness. Thus, we conclude that the district court did not err in failing to instruct the jury on reckless aggravated battery.

2. *Voluntary Intoxication Instruction*

The district court appropriately instructed the jury that "Voluntary intoxication is not a defense to a charge of aggravated battery." This instruction was taken directly from

17

PIK Crim. 4th 52.050. However, the district court denied Cox's request that the following instruction also be given:

> "The defendant claims that he was intoxicated during the time that the crime was committed. An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind. Defendant states that he did not knowingly commit the crime charged by the State. Defendant maintains that he committed the crime recklessly. It is up to you to determine whether he did the crime knowingly or recklessly and you can consider his state of voluntary intoxication in arriving at your determination."

We do not find such an instruction to be legally or factually appropriate in this case. Again, there is no evidence that Cox was acting recklessly when he repeatedly beat Kirk over the course of several hours. The instruction requested by Cox states that it was up to the jurors "to determine whether [Cox] did the crime knowingly or recklessly and you can consider his state of voluntary intoxication in arriving at your determination." But aggravated battery is a general intent crime, and voluntary intoxication is not a defense to general intent crimes. *State v. Kershaw*, 302 Kan. 772, 778-82, 359 P.3d 52 (2015); *State v. Hobbs*, 301 Kan. 203, 211, 340 P.3d 1179 (2015).

Moreover, the instruction requested by Cox is not found in PIK Crim. 4th, whereas the instruction given by the district court is taken verbatim from PIK Crim. 4th 52.050. Although district courts are not required to use PIK instructions, their use is strongly recommended because they have been developed by a knowledgeable committee to create accuracy, clarity, and uniformity for jury instructions. See *State v. Barber*, 302 Kan. 367, 377-78, 353 P.3d 1108 (2015); *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009). Thus, we conclude that the district court did not err in failing to give the jury the voluntary intoxication instruction that Cox requested.

18

3. *Sympathy Instruction*

Cox also argues that the district court erred in failing to instruct the jury on sympathy. Although he did not include a sympathy instruction in his proposed jury instructions, Cox asked for one to be given at the instruction conference. Defense counsel recognized that PIK Crim. 4th does not include a sympathy instruction and that the sympathy jury instruction in PIK Crim. 3d was to rarely be given. Nevertheless, defense counsel argued that the instruction was warranted because "[t]his poor woman had her face and body shown and she cried on the witness stand. I would think that maybe sympathy might be an instruction that would be viable here." Relying on the absence of a sympathy instruction in PIK Crim. 4th, the district court denied Cox's request.

The Kansas Supreme Court has found that "a no-sympathy instruction is only legally appropriate in very unusual circumstances." *State v. Williams*, 299 Kan. 1039, 1044, 329 P.3d 420 (2014). "The tougher question is whether the instruction was factually appropriate, *i.e*., whether the facts of this case presented very unusual circumstances." 299 Kan. at 1044. It appears that the only case in which the Kansas Supreme Court has found that sufficiently unusual circumstances existed to allow a sympathy instruction was *State v. Rhone*, 219 Kan. 542, 545, 548 P.2d 752 (1976), in which the district court had taken the parties and the jury to the victim's home so she could testify because she was too ill with cancer to testify in the courtroom. See *State v. Baker*, 281 Kan. 997, 1005, 135 P.3d 1098 (2006).

Discussing the *Rhone* decision in *Williams*, the Kansas Supreme Court found:

> "Certainly, a defendant's display of emotion is not as unusual as conducting court
> in an ailing victim's home. Nevertheless, we should view the cold record through a
> deferential lens, recognizing that the veteran trial judge was in a better position to assess
> whether the defendant's courtroom demeanor was an unusual circumstance that needed to
> be addressed for the jury. Moreover, none of the cases presented by the parties is so

19

factually similar as to mandate a result here, and we are inclined to side with the discretion of the trial judge." *Williams*, 299 Kan. at 1044-45.

Here, we can only speculate as to whether Kirk was emotional during her testimony because there is nothing in the record to support such a conclusion. As such, the district court was in a better position to assess the situation. Moreover, looking at the instructions as a whole, we see that the jurors were instructed that it was their responsibility to determine the weight and credit to be given to the testimony of each witness, that they had the right to rely upon common knowledge and experience with respect to matters about which a witness had testified, and that they must decide the case by applying the instructions to the facts as they found them. Certainly, we have no reason to believe that the jury failed to follow these instructions. Thus, we do not find that the district court erred in denying Cox's request for a sympathy instruction.

*Use of Trial Jury to Determine Departure Factors*

If a fact other than a prior conviction will be used to increase a sentence beyond the statutory maximum, such as when the fact will be used for an upward durational departure, that fact must be submitted to a jury and proved beyond a reasonable doubt. K.S.A. 2015 Supp. 21-6817(b). Furthermore, K.S.A. 2015 Supp. 21-6817(b)(4) provides:

> "(4) If the court determines it is in the interest of justice, the court shall conduct a separate departure sentence proceeding to determine whether the defendant may be subject to an upward durational departure sentence. Such proceeding *shall be conducted by the court before a jury as soon as practicable. If any person who served on the trial jury is unable to serve on the jury for the upward durational departure sentence proceeding, the court shall substitute an alternate juror who has been impaneled for the trial jury.* If there are insufficient alternate jurors to replace trial jurors who are unable to serve at the upward durational departure sentence proceeding, the court may conduct such upward durational departure sentence proceeding before a jury which may have 12 or less jurors, but at no time less than six jurors. Any decision of an upward durational

20

departure sentence proceeding shall be decided by a unanimous decision of the jury. Jury selection procedures, qualifications of jurors and grounds for exemption or challenge of prospective jurors in criminal trials shall be applicable to the selection of such jury. The jury at the upward durational departure sentence proceeding may be waived in the manner provided by K.S.A. 22-3403, and amendments thereto, for waiver of a trial jury. If the jury at the upward durational departure sentence proceeding has been waived, the upward durational departure sentence proceeding shall be conducted by the court." (Emphasis added.)

On its face, we find that the this subsection of K.S.A. 2015 Supp. 21-6817(b)— which was amended in 2011—contemplates that a district court may use the trial jury to determine whether a defendant is subject to an upward departure sentence. Although subsection (b)(4) provides a procedure for having a different jury make this determination, it is not required. Prior to the 2011 amendments, the second sentence of K.S.A. 21-4718(b)(4) provided that a proceeding to determine if a defendant may be subject to an upward departure "shall be conducted by the court before *the trial jury* as soon as practicable." (Emphasis added.) K.S.A. 2010 Supp. 21-4718(b)(4). Similarly, the last sentence of the statute stated that "[i]f the jury at the upward durational departure sentence proceeding has been waived or *the trial jury* has been waived, the upward durational departure sentence proceeding shall be conducted by the court." (Emphasis added.) K.S.A. 2010 Supp. 21-4718(b)(4).

In *State v. Horn*, 291 Kan. 1, 8-9, 238 P.3d 238 (2010), the Kansas Supreme Court found that the prior statutory language appeared to require the use of the trial jury in the departure sentence proceeding. In the 2011 legislative session, the Kansas Legislature addressed the *Horn* decision by amending K.S.A. 2010 Supp. 21-4718(b)(4) by striking the words, "the trial" and replacing it with the indefinite article, "a," so that the subsection now provides the option of whether to use the trial jury or a different jury to make the determination regarding an upward departure. L. 2011, ch. 91, sec. 39. In other words, the amended subsection now simply requires that the departure factors must be decided by a

21

jury—but not necessarily the trial jury—unless there is a proper waiver of the right to have the departure factors decided by a jury. See *State v. Bennett*, 51 Kan. App. 2d 356, 368, 347 P.3d 229, *rev. denied* 303 Kan. ___ (2015).

Accordingly, we find that based on the plain language of the current version of subsection (b)(4), the district court has the discretion to decide whether to have the trial jury or another jury determine the upward departure factors. Moreover, we do not find that the district court abused its discretion in using the trial jury to determine the upward departure factors. Likewise, we do not find that this decision was prejudicial to Cox. Rather, based on our review of the record, we find that Cox voluntarily chose to advise the jury of his prior domestic violence convictions during the trial instead of waiting until the departure phase of the proceedings. Thus, we do not find the district court erred.

*Imposition of Upward Departure*

Finally, Cox contends that the upward departure sentence imposed by the district court was erroneous. First, he argues that the State's use of his prior crimes in both his criminal history and as a basis for departure violated his right to be free from double jeopardy. Second, he argues that the stated reason for a departure sentence was not substantial and compelling.

Whether Cox's protection against double jeopardy was violated is a question of law over which this court has unlimited review. See *State v. Morton*, 283 Kan. 464, 468, 153 P.3d 532 (2007). Cox maintains that the district court's reliance on his future dangerousness violated his right not to be put in double jeopardy because it was based on his prior convictions, which were also used to determine his sentence as part of his criminal history.

The Double Jeopardy Clause states that no person can "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; § 10 of the Kansas Constitution Bill of Rights. The United States Supreme Court has interpreted this to protect an individual from being (1) tried again for the same crime after an acquittal, (2) tried again for the same crime after a conviction, or (3) punished more than once for the same crime. *United States v. DiFrancesco*, 449 U.S. 117, 129, 101 S. Ct. 426, 66 L. Ed. 2d 328 (1980); *State v. Cady*, 254 Kan. 393, 396, 867 P.2d 270 (1994).

Cox asserts that his double jeopardy rights were violated under the Fifth Amendment and § 10 of the Kansas Constitution Bill of Rights when the State used future dangerousness as a departure factor. According to Cox, the double jeopardy violation occurred when his prior convictions were used to put him on the sentencing grid and were used again as evidence to prove the aggravating factor that resulted in his upward departure sentence.

"'The common inquiry across the Court's Eighth Amendment, ex post facto, and double jeopardy jurisprudence is determining whether the government's sanction is punitive in nature and intended to serve as punishment.'" *State v. Petersen-Beard*, 304 Kan. 192, 196, ___ P.3d ___, 2016 WL 1612851 (2016) (quoting *Hinds v. Lynch*, 790 F.3d 259, 264 n.5 [1st Cir. 2015]) (time for filing petition for cert. pending).

Here, the focus of the State's evidence was not on the convictions themselves or on his general criminal history. The focus was on how Cox handled himself after his prior convictions and during the time he was being supervised on probation or parole. The prior convictions were introduced primarily to show the escalating nature of Cox's actions in order to predict his future dangerousness. Although the finding that he was a future danger to society was based, in part, on his criminal history, his upward departure sentence was based on his future dangerousness and not his criminal history.

23

In arguing for the upward departure sentence, the State specifically argued, "Again, I want to be clear about this. It's not just that he has the convictions that he talked about. It's not that. It's what the convictions and the timing of those convictions say about future dangerousness. That's what you are to consider." The introduction of the evidence to prove the aggravating factor at sentencing did not violate Cox's double jeopardy rights. See *State v. Moore*, No. 109,553, 2015 WL 1310046, *12 (Kan. App. 2015) (unpublished opinion), *rev. denied* 304 Kan. __ (2016); *Green v. State*, No. 106,445, 2013 WL 2321033, *10 (Kan. App.) (unpublished opinion), *rev. denied* 298 Kan. 1201 (2013); *State v. Angilda*, No. 106,226, 2013 WL 1234188, *9 (Kan. App.) (unpublished opinion), *rev. denied* 291 Kan. 1247 (2013).

At sentencing, a district court is required to impose the presumptive sentence provided by the Kansas Sentencing Guidelines Act (KSGA) unless the district court finds "substantial and compelling reasons to impose a departure" sentence. K.S.A. 2015 Supp. 21-6815(a). "Substantial" means something real, not imagined; something with substance, not ephemeral. *State v. Blackmon*, 285 Kan. 719, 724, 176 P.3d 160 (2008). "Compelling" means that the circumstances of the case force the sentencing court "to abandon the status quo and to venture beyond the sentence that it would ordinarily impose." 285 Kan. at 724.

K.S.A. 2015 Supp. 21-6815(c)(2) contains a nonexclusive list of aggravating factors which may be considered when determining whether substantial and compelling reasons exist for an upward departure. A sentencing court also may consider nonstatutory factors "'as long as there is evidence in the record to support such factors and the use of the factors would be consistent with the intent and purposes of the [KSGA].' [Citations omitted.]" *State v. Hines*, 296 Kan. 608, 616, 294 P.3d 270 (2013).

When considering whether the record supports an articulated reason for departing, we review for substantial competent evidence. When determining whether a particular

24

factor can be substantial and compelling in any case as a matter of law, our review is unlimited. And when the record supports the articulated departure reasons and the articulated reasons are legally valid, we apply an abuse of discretion standard to determine whether the factor constituted a substantial and compelling reason to depart. *State v. Reed*, 302 Kan. 227, 249, 352 P.3d 530, *cert. denied* 136 S. Ct. 344 (2015). A sentencing court's use of statutory factors are not be reviewed with greater deference than a decision to rely upon nonstatutory factors, and the use of nonstatutory factors should not receive stricter scrutiny. *State v. Martin*, 285 Kan. 735, 747 175 P.3d 832 (2008).

Cox argues that the future-dangerousness factor is not based on anything real or of substance because it was based on what he may do in the future. He also argues that he had been trying to rehabilitate himself while he was incarcerated for 29 months pending trial, and to determine whether those efforts will make a difference in 14 years when he will be released from prison is unknown. According to Cox, future dangerousness could apply to any criminal, especially one with a lengthy criminal history. He maintains that protecting the public is the reason for the presumptive sentence and that there is nothing unique or extraordinary about Cox's criminal history that would compel the district court to depart.

Cox's future dangerousness constituted substantial and compelling reasons to depart. The State argues that the escalation of Cox's actions despite the punishments he received for those actions made his situation unique and beyond the normal sentencing range. The jury found that there were facts to believe that Cox presented a risk of future dangerousness to the public safety. Thus, we conclude that the district court did not err in granting the State's motion for an upward departure sentence.

Affirmed.

25